In re Richard A. VILLANI, d/b/a Fishy Business, Inc. d/b/a CR Oakcrest Cove, Inc. d/b/a Villani Construction, Inc., Debtor.

Donald Cox, Plaintiff–Appellant,

v.

Richard A. Villani, Defendant–Appellee.

BAP No. MB 11–096.
Bankruptcy No. 09–10577–WCH.
Adversary No. 10–01118–WCH.

United States Bankruptcy Appellate Panel of the First Circuit.

Aug. 28, 2012.

John A. Burdick, Jr., Esq., Paxton, MA, on brief, for Plaintiff–Appellant.

Jeffery Johnson, Esq., on brief, for Defendant–Appellee.

Before HAINES, DEASY, and TESTER, United States Bankruptcy Appellate Panel Judges.

TESTER, Bankruptcy Judge.

Donald Cox ("Cox") appeals from a bankruptcy court judgment ("the Judgment") entered in favor of the debtor, Richard A. Villani ("Villani"), on Cox's complaint objecting to his discharge under

§ 727(a)(2)(A).[1] For the reasons discussed below, we **REVERSE** the Judgment.

### BACKGROUND

In August 2006, Cox sold a catering business to CR Oakcrest Cove, Inc. ("Oakcrest"), an entity owned by Villani and Richard Galt ("Galt").[2] In consideration for the catering business, Cox received $200,000.00 at closing, and a promissory note in the amount of $300,000.00 ("the Note") for the remaining balance from Oakcrest, Villani, and Galt (collectively the "Obligors"). The Note required the Obligors to make annual payments each September, and further provided for the acceleration of all payments in the event of default. Villani admitted in the proceedings below that the Obligors never made a payment on the Note.

In October 2007, Cox filed a five-count complaint ("the state court complaint") against the Obligors, seeking up to $400,000.00 in damages for the default in their obligations due under the Note. Cox also sought a preliminary injunction against the "reach and apply defendants," Villani Construction, Inc., Fishy Business, Inc., and Barnstable Roofing and Siding, Inc. (collectively "the reach and apply defendants"), entities in which Villani and Galt allegedly had a beneficial interest. Contemporaneously with the state court complaint, Cox filed motions for the issuance of a writ of attachment and trustee process, *ex parte*, against the "trustee defendants," Cape Cod Cooperative Bank, Banknorth, and Community Bank (collectively "the trustee defendants"), which the court granted.

On or about October 17, 2007, the state court entered a temporary restraining order,[3] and scheduled a hearing on the request for a preliminary injunction for October 25, 2007. After the hearing, the state court issued a preliminary injunction which provided, in pertinent part:

> [T]he defendant(s), [ ] Oakcrest [ ], [ ] Villani, [ ] Galt, Fishy Business Inc[.,] its agents, servants, attorneys and deputies are to pay all dividends and other monies due and as they become due from said corporations directly or indirectly to defendants, [ ] Oakcrest [ ], [ ] Villani [ ] and/or [ ] Galt, up to $400,000.00 other than to pay same directly to Alan M. Cohen, Esq., to be held in escrow as prejudgment security for the benefit of the plaintiff, pending further order of the [c]ourt[.][4]

Villani subsequently filed a petition for chapter 7 bankruptcy relief in January

---

1. Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§ " refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.,* as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 37. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule" are to the Federal Rules of Civil Procedure.

2. On his Statement of Financial Affairs, Villani indicated that he was an officer, director, partner, or managing executive of Oakcrest, a catering business, from September 2006 to January 2008. Additionally, he reported interests in Villani Construction, Inc., a construction business, from January 1, 2003 to the date of filing, and Fishy Business, Inc., a fish market, from May 2007 to April 2008.

3. Pursuant to the terms of the temporary restraining order, the state court directed Villani and the reach and apply defendants to pay all sums due from the Obligors, up to $400,000.00, to be held in escrow as prejudgment security for Cox's benefit.

4. It appears from the record that in the state court action, Cox obtained a $413,620.56 judgment against Galt, only, on August 11, 2008. In his brief, however, Cox indicates that he obtained a judgment against Villani, as well. Neither the record nor the parties' briefs explain this discrepancy.

2009. On Schedule F of his petition, Villani listed Cox as the holder of a disputed claim in the amount of $400,000.00, incurred in October 2007 on account of "trade debt." In May 2009, Cox filed a proof of claim in the amount of $379,378.74, indicating that the security for the claim was a "[t]rustee attachment" and an attachment of real estate, which he neglected to identify. The chapter 7 trustee objected to the allowance of Cox's claim as a secured claim, and requested the entry of an order allowing it as a general, unsecured claim. The court entered an order sustaining the trustee's objection in March 2010. Cox did not appeal that order.

Thereafter, in April 2010, Cox commenced an adversary proceeding with a single-count complaint ("the adversary complaint"), objecting to Villani's discharge pursuant to § 727(a)(2)(A),[5] on the grounds that he "transferred and concealed at least $130,000.00 ... in direct violation of the [p]reliminary [i]njunction...." In the adversary complaint, Cox challenged three transactions which postdated the preliminary injunction and related to Villani's treatment of funds. First, he alleged that on May 5, 2008, Villani deposited the $85,500.00 he received from the sale of his boat into Villani Construction, Inc.'s payroll account. According to Cox, Villani then paid $85,500.00 from the payroll account to Wells Fargo Home Mortgage ("Wells Fargo"), to reduce the first mortgage on his residence. Second, Cox alleged that Villani deposited the $21,719.86 he received in settlement of damage to his truck, into Villani Construction Inc.'s payroll account on August 1, 2008. Thereafter, on October 9, 2008, according to Cox, Villani transferred $18,257.36 from the payroll account to Wells Fargo to further reduce his first mortgage. Third, Cox alleged that on February 28, 2008, Villani withdrew $36,892.03 from his MetLife retirement account, which he then deposited in the personal account of Stacey Sullivan ("Sullivan"), his girlfriend and bookkeeper. According to Cox, Sullivan, in turn, "transferred $27,000.00 of said funds to three ... of [Villani's] related now-defunct corporate entities, paid [his] credit cards, and reimbursed herself for $9,852.03 for her payments of [Villani's] personal bills." Additionally, Cox alleged in the adversary complaint, without specifying dates or amounts, that Villani paid personal expenses from Villani Construction, Inc.'s operating account.

In June 2010, Villani filed an answer to the adversary complaint, in which he: 1) denied that he personally made deposits of either the insurance settlement proceeds or the boat proceeds; 2) denied that any of the subject transfers violated § 727(a)(2) or any court order; 3) asserted that his boat, investment accounts, and vehicles were not subject to attachment and were, therefore, "his to dispose of as he saw fit;" and 4) admitted that he authorized Sullivan to make payments on "whichever of his two home mortgages she deemed appropriate" and to pay other necessary personal and corporate bills. Additionally, Villani asserted numerous affirmative defenses, including that Cox failed to secure the subject assets by obtaining a proper prejudgment attachment.

At the trial conducted in December 2011, Villani conceded that the transfers

---

**5.** Although Cox stated in the adversary complaint that he was proceeding under § 727(a)(2)(B), he actually set forth a cause of action under § 727(a)(2)(A), insofar as it was based on Villani's alleged efforts to hinder and delay creditors. During trial, the court observed that the reference to § 727(a)(2)(B) in the adversary complaint was a typographical error and Cox's attorney did not object.

complained of were, in fact, made;[6] the parties agreed that the only remaining issue for trial was whether Villani made the transfers with the intent to "hinder, delay, or defraud," within the meaning of § 727(a)(2)(A). Villani testified that in the months following October 2007, he experienced financial difficulties as a result of the general downturn in the economy. In fact, for the years 2007, 2008, and 2009, his tax returns showed negative income. Oakcrest lost $49,596.00 in 2007 and $61,711.00 in 2008; Fishy Business, Inc. lost $49,528.00 in 2007 and $66,997.00 in 2008. Villani's construction businesses, Barnstable Roofing & Siding, Inc. and Villani Construction, Inc., however, earned $80,502.00 in 2007 and $110,053.00 in 2008. Villani testified that he used this income to keep his other businesses afloat. According to Villani, at the time of the challenged transfers, he was aware that Cox had sued him, and that one of his properties was in foreclosure. He testified, however, that he had only a twelfth-grade education, and a limited understanding of legal and financial matters. For example, he stated that he did not understand that "there was an order from a court that prevented [him] from using money in certain accounts." Additionally, when asked if he recalled signing his bankruptcy petition under the pains and penalties of perjury, he replied, in pertinent part:

[ ] I didn't deal with (unclear) this stuff. Stacy [Sullivan] would get this stuff and then she would break it down for me because I don't understand this stuff, Your Honor, and [Jeffery Johnson, Esq.] would break it down to me.

At trial, Villani conceded that the insurance and boat proceeds were deposited in Villani Construction, Inc.'s payroll account, and that the MetLife proceeds went into Sullivan's account; he acknowledged that disbursements from those accounts paid not only his personal expenses, but expenses associated with his businesses, as well. Villani also testified that $10,000.00 of the MetLife withdrawal was paid to Sullivan, as reimbursement of sums she had advanced to him to help pay his bills. He explained that his primary concern when he instructed Sullivan to pay down the mortgage on his home was to save the house from foreclosure in order to maintain a home for his 30–year–old, disabled son. He further explained that he had "borrowed ... money against the house" in order to purchase the boat, and therefore, sold the boat to "pay the house down." He expressed his rationale for selling the boat as follows: "the first thing you do is you get rid of your toys." He stated that after having consulted with an attorney during the pendency of the state court action, he believed that the preliminary injunction did not preclude his sale of personal assets. He also testified that he did not think it was improper to withdraw money from the Metlife account because it was not subject to attachment.

Sullivan testified that she had known Villani for nearly 18 years, that he trusted her to make financial decisions on his behalf, and that she was authorized to sign checks in his name. She described their process for making financial decisions as follows:

[I]f I've got a question, or I want to do something and I need him to confirm, "Yeah, do it," I would call him. More often than not it was on the phone, and I'll call him, and I'll–He'll be half paying attention to me, and I'll say, "Hey, you want me to deposit—?" "Yeah, yeah,

---

**6.** In his Statement of Financial Affairs, however, in response to question 10A, "list all other properties transferred ... within two years immediately preceding commencement of the case," Villani answered "None."

whatever." And in the meantime he's telling somebody to go and take bundles up on the roof, and you know, do all that stuff. So was he paying attention to me? I'm lucky if I'm getting half.

In her testimony, Sullivan claimed responsibility for the decision to withdraw funds from the MetLife account. She specifically recalled: "I probably just [told] him, 'You need, you know, X amount of dollars.'"

According to Sullivan, she had a similar conversation with Villani regarding the disposition of the boat proceeds. She stated:

It was probably a phone call, or a, you know, early morning discussion, you know, face to face real brief; you know, "Should I just deposit this?" "Yeah go ahead."

Q. And did you have a discussion as to where they money was to go—

A. No, [ ]—I would have just deposited it.

Q. And sometime after that the money was used to do what, that 85.5?

A. It went—[ ] towards the principal mortgage on his home. . . .

Q. And who accomplished paying that down?

A. I did.

Q. So you filled out all the paperwork?

A. Yeah, if there was paperwork, or anything associated with it, I would have done it.

Sullivan's testimony demonstrated that she similarly handled, if not controlled, the disposition of the proceeds from the insurance settlement:

Q. And then at some point [Villani's] daughter totaled the car?

A. Right.

Q. And the check from the proceeds that—Who filled out the insurance paperwork for that?

A. I did.

Q. Okay. And at some point you received a check?

A. Yeah, I think it was around 21,-000[.00].

Q. And do you remember where that money went?

A. That got deposited into the Villani Construction[, Inc.] payroll account.

Q. And then where was that money disbursed, how was that money—

A. If memory serves, once again, I held some of it and used some of it for Villani Construction[, Inc.] until some receivables came in, and then I would put the balance of that on . . . the principal mortgage.

Sullivan testified that she deposited the MetLife money into her own checking account because the Oakcrest account and Villani's personal account had been attached. She explained that she opened the payroll account for Villani Construction, Inc., because "a woman at the bank" advised her "if an account was labeled a payroll account, then it's [ ] safe."

In his closing argument, Cox's attorney asserted that the totality of circumstances demonstrated that Villani intended to hinder, delay, and defraud creditors when he transferred the above-described assets within one year of filing his bankruptcy petition. He argued that the seven indicia of fraud articulated in *Marrama v. Citizens Bank (In re Marrama)*, 445 F.3d 518, 522 (1st Cir.2006), were present. Villani's attorney countered:

[ ] Villani believed what he was doing was permissible. He believed he wasn't restrained from doing it . . . [T]he methods by which it was accomplished weren't his idea. It was done by [ ] Sullivan

as a convenient way of transacting those things. You heard him testify that he struggled to keep the businesses alive.

Ruling from the bench in Villani's favor, the bankruptcy court found that he lacked the intent to hinder, delay, or defraud Cox, specifically, and creditors, generally. The court reached this conclusion despite its recognition of certain indicia of intent to hinder or delay creditors, namely Villani's deposits into accounts which were not subject to attachment, and his efforts "to protect his assets, including his house." The court also found that Villani "was real sloppy with money." The court nonetheless declared: "What strikes me is that he never thought about [ ] Cox at all." The same day, the Judgment entered for Villani. This appeal followed.

### *JURISDICTION*

■ We are duty-bound to determine our jurisdiction before proceeding to the merits, even if not raised by the litigants. *See In re George E. Bumpus, Jr. Constr. Co.*, 226 B.R. 724 (1st Cir. BAP 1998). We may hear appeals from "final judgments, orders and decrees [pursuant to 28 U.S.C. § 158(a)(1) ] or with leave of the court, from interlocutory orders and decrees [pursuant to 28 U.S.C. § 158(a)(3) ]." *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998) (internal quotations omitted). "A final judgment is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Vazquez Laboy v. Doral Mortgage Corp. (In re Vazquez Laboy)*, 647 F.3d 367, 372 (1st Cir.2011) (citation and internal quotations omitted). A bankruptcy court's judgment following the trial of a § 727(a)(2)(A) claim is final for appeal purposes. *Wardrip v. Hart (In re Hart)*, 271 B.R. 213 (10th Cir. BAP 2001)

(citation omitted). Accordingly, we have jurisdiction to hear this appeal.

### *STANDARD OF REVIEW*

■ A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo.* *Lessard v. Wilton–Lyndeborough Coop. School Dist.*, 592 F.3d 267, 269 (1st Cir. 2010); *see also Watman v. Groman (In re Watman)*, 331 B.R. 502, 507 (D.Mass. 2005), *aff'd*, 458 F.3d 26 (1st Cir.2006); *Warchol v. Barry (In re Barry)*, 451 B.R. 654, 658 (1st Cir. BAP 2011). "Whether a debtor possessed the necessary wrongful intent under § 727(a)(2)(A) is a question of fact, subject to the clearly erroneous standard of review." *In re Barry,* 451 B.R. at 658 (citation and internal quotations omitted). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Stornawaye Fin. Corp. v. Hill (In re Hill)*, 387 B.R. 339, 345 (1st Cir. BAP 2008) (citation and internal quotations omitted), *aff'd* 562 F.3d 29 (1st Cir.2009). "If the trial court's account of the evidence is plausible, in light of the record viewed in its entirety, a reviewing court may not reverse, even if convinced that if it had been sitting as a trier of fact, it would have weighed the evidence differently." *Id.* (citation omitted). In reviewing a bankruptcy court's findings of fact, " 'due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.' " *In re Watman,* 331 B.R. at 506 (citing Fed. R. Bankr.P. 8013; *In re G.S.F. Corp.,* 938 F.2d 1467, 1474 (1st Cir.1991)).

### *POSITIONS OF THE PARTIES*

Cox argues on appeal that because the seven badges of fraud articulated by the

First Circuit in *Marrama, supra,* are present in this case, the bankruptcy court clearly erred in finding that Villani lacked the requisite intent under § 727(a)(2)(A). Accordingly, he asks the Panel to reverse the Judgment of the bankruptcy court. Villani counters that because Cox failed to satisfy his burden of proving that he intended to hinder, delay, or defraud creditors, the bankruptcy court correctly upheld his right to a discharge.

## DISCUSSION

### I. The Denial of Discharge

Section 727(a)(2)(A) provides in pertinent part that:

(a) The court shall grant the debtor a discharge, unless—...

(2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed—

(A) property· of the debtor, within one year before the date of the filing of the petition....

11 U.S.C. § 727(a)(2)(A).

■ "Given the serious nature of a discharge denial, the reasons for denying a discharge must be real and substantial, not merely technical and conjectural." *Annino, Draper & Moore, P.C. v. Lang (In re Lang),* 246 B.R. 463, 468 (Bankr.D.Mass. 2000) (internal quotations and citations omitted), *aff'd,* 256 B.R. 539 (1st Cir. BAP 2000). "In light of the effect on the [d]ebtor, a denial of discharge is an extreme step that should not be taken lightly ..., and, therefore, the provisions of § 727 should be construed liberally in favor of debtors." *Id.* (internal and external citations omitted). "Objections to discharge should be narrowly construed in furtherance of the Bankruptcy Code's fresh start policy and the claimant must show that its claim comes squarely within an objection enumerated in Bankruptcy Code § 727(a)(2)." *Id.* (internal quotations and citation omitted). The purpose of § 727(a)(2)(A) "is to make certain that those who seek·the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs." *Id.* (internal quotations and citations omitted). The party objecting to discharge bears the burden of establishing each element of § 727(a)(2)(A) by a preponderance of the evidence. *Id.* (citations omitted).

■ "The First Circuit has ruled that four elements are required to deny a discharge under § 727(a)(2)(A): '(1) transfer or concealment of property, (2) that belonged to the debtor, (3) less than a year before the bankruptcy petition, (4) with actual intent to hinder, delay, or defraud a creditor.'" *In re Barry,* 451 B.R. at 659 (citing *In re Marrama,* 445 F.3d at 522; *Razzaboni v. Schifano (In re Schifano),* 378 F.3d 60, 66–67 (1st Cir.2004)). Villani concedes the existence of the first three elements. Thus, the only issue before us is whether, upon the record before it, the bankruptcy court clearly erred when it found that the fourth element—intent to hinder, delay or defraud a creditor—was absent.

### II. The Intent Issue

#### A. The Standard

■ "In determining whether a debtor possessed culpable intent within the meaning of § 727(a)(2)(A), courts traditionally consider the totality of circumstances." *In re Barry,* 451 B.R. at 659 (citations omitted) (internal quotations omitted). "Because a debtor rarely gives direct evidence of fraudulent intent," the First Circuit recognizes that intent to defraud a creditor can be proved by circumstantial evidence. *In re Marrama,* 445 F.3d at 522 (citation omitted).

■ The First Circuit instructs courts to look to the following "objective indicia" of fraudulent intent:

(1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial condition of the [debtor] both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by the debtor to keep the transfer a secret.

*Id.* (citing *In re Watman*, 301 F.3d at 8) (brackets in the original). "While the presence of a single factor as set forth above may lead to mere suspicion for § 727(a)(2) purposes, the accumulation of several factors indicates strongly that a debtor possessed the requisite improper intent." *In re Lang*, 246 B.R. at 469 (citations omitted).

### B. The Standard Applied

■ The record reflects that Villani placed the boat, insurance, and Metlife proceeds under the control of Sullivan, with whom he had a confidential relationship; thereafter, the boat and insurance proceeds were deposited in a payroll account admittedly created to shield funds from creditors. *See Locke v. Schafer (In re Schafer)*, 294 B.R. 126, 131 (N.D.Cal. 2003) (holding debtor commits violation of § 727(a)(2)(A) by opening a new bank account in order to avoid creditor's attachment of existing account). The remaining transfer, the deposit of the Metlife proceeds, was to an account under Sullivan's sole control. In fact, the bankruptcy court, itself, recognized that "[p]utting the

money into accounts which were not subject to attachment was a factor which 'tend[ed] to show the evil intent of trying to hinder, delay, or defraud.'" Moreover, Villani introduced no evidence, other than Sullivan's self-serving testimony, that he received valuable consideration for the subsequent $10,000.00 payment to her from the Metlife proceeds. *See In re Lang*, 246 B.R. at 470 (holding when debtor transfers property gratuitously or to relatives on eve of bankruptcy, presumption of fraudulent intent arises). It is undisputed that Villani applied the insurance and boat proceeds to reduce his mortgage in order to safeguard his home from foreclosure, an "inescapable reference to protection from his creditors." *In re Marrama*, 445 F.3d at 524. Again, the court found that this fact did not "bode ... well" for Villani. There is no question that Villani made all of the transfers while in financial distress; the general chronology of events demonstrates that each transaction was consummated on the heels of the preliminary injunction and in the shadow of Villani's bankruptcy filing. Additionally, Villani failed to disclose any of the subject transfers on his Statement of Financial Affairs.

A review of the record within the framework of the *Marrama* criteria reveals the presence of every badge which the First Circuit has identified. In addition to the existence of these factors, the record reflects a series or pattern of transfers as well. While any of the transfers could constitute an independent ground for denying Villani's discharge, viewed together, they firmly establish that Villani possessed the requisite improper intent. *See In re Barry*, 451 B.R. at 663 (stating that where record disclosed not only plethora of factors from which intent to hinder or delay may be inferred, but a series of transfers as well, finding of intent was warranted).

In *Marrama,* the First Circuit concluded that denial of discharge was warranted under analogous circumstances. *See In re Marrama,* 445 F.3d at 524.

■ Both in the proceedings below and on appeal, Villani offers several exculpatory arguments to negate the presence of improper intent, all of which have been rejected previously by the First Circuit or this Panel. For example, although Villani argues that by the challenged transfers, he paid legitimate trade and personal debt, we have already rejected a similar argument in *Barry,* where we ruled that "a debtor may not act to prefer one creditor with the specific intent to delay impermissibly another creditor." 451 B.R. at 662; *see also Cadle Co. v. Marra (In re Marra),* 308 B.R. 628, 630 (D.Conn.2004) (holding "mere fact that the debtor's actions were intended to benefit some creditors does not necessarily preclude a finding that the debtor also intended to hinder or delay another creditor, thus warranting denial of a discharge"); *In re Schafer,* 294 B.R. at 131 (stating withholding funds from one creditor to pay another does not excuse § 727 violation).

■ Furthermore, although Villani testified that he had only a high school education and professed a limited understanding of legal matters, we recently rejected a debtor's asserted lack of sophistication as justification for a § 727 violation where, as here, the debtor's multiple business and real estate interests actually reflected that he was experienced in financial affairs. *See Harrington v. Donahue (In re Donahue),* No. 10–01071, 2011 WL 6737074, at *13 (1st Cir. BAP Dec. 20, 2011). Nor can Villani's claim that decisions concerning the disposition of his assets were solely the responsibility of his girlfriend and bookkeeper absolve him of a § 727(a)(2)(A) violation; moreover, by surrendering control of his finances to Sulli-

van in this manner, Villani demonstrated the type of extreme carelessness or reckless indifference that equates to fraud and a bar to discharge, rather than benign inattention to detail. *See Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir.1997) (holding in the context of a § 523(a)(2)(A) determination that reckless disregard is a factor that is "probative of intent to defraud").

■ Similarly unavailing under the law of this circuit is Villani's argument that he engaged in the subject transfers in reliance upon the advice of counsel, who had informed him that the preliminary injunction did not prevent him from transferring personal assets (but apparently neglected to warn him of potential § 727(a)(2)(A) issues). *See, e.g., Boroff v. Tully (In re Tully),* 818 F.2d 106, 111 (1st Cir.1987) (upholding denial of debtor's discharge under § 727(a)(4) for failure to disclose pre-petition assets and rejecting debtor's argument that the omissions were attorney error). "Generally speaking, a debtor may not escape the consequences of acting in violation of the Bankruptcy Code by pleading ignorance and pointing the finger at former (or current) counsel as the bearer of bad advice." *Houghton v. Marcella (In re Marcella),* No. 07–04158, 2009 WL 3348251, at *16 (Bankr.D.Mass. Oct. 15, 2009) (citing *In re Tully,* 818 F.2d at 111). In any event, Villani's "reliance on counsel" argument is particularly ineffective in light of his lack of candor in failing to disclose the transfers in his Statement of Financial Affairs.

We are mindful that the First Circuit requires us to accord deference to the original finder of fact in the context of determinations concerning fraudulent intent. *See Commerce Bank & Trust Co. v. Burgess (In re Burgess),* 955 F.2d 134, 137 (1st Cir.1992). Based on the totality of the record before us viewed in the light of the

prevailing law of this circuit, however, it is implausible that Villani lacked the intent to hinder, delay, or defraud his creditors when he transferred significant assets less than a year before filing a petition for chapter 7 relief. We are, therefore, left with the conviction that a mistake has been made.

### *CONCLUSION*

The bankruptcy court erred when it determined that Villani lacked the intent to hinder, delay, or defraud creditors within the meaning of § 727(a)(2)(A). Accordingly, we **REVERSE** the Judgment and **REMAND** with instructions to the bankruptcy court to enter a judgment denying Villani's discharge.