Thomas P. McCARTHY, Debtor.

Robin Singh Educational Services,
Inc., d/b/a TestMasters,
Plaintiff–Appellee,

v.

Thomas P. McCarthy, Defendant–
Appellant.

BAP No. MB 12–059.
Bankruptcy No. 10–11788–JNF.
Adversary No. 10–01309–JNF.

United States Bankruptcy Appellate Panel
for the First Circuit.

March 22, 2013.

Walter Oney, Esq., Fitchburg, MA, on brief, for Defendant–Appellant.

Charles J. Domestico, Esq. and Vincent M. Domestico, Esq., Framingham, MA, on brief, for Plaintiff–Appellee.

Before HAINES, TESTER, and GODOY, United States Bankruptcy Appellate Panel Judges.

GODOY, Bankruptcy Judge.

Thomas P. McCarthy (the "Debtor") appeals from the bankruptcy court's order denying his discharge pursuant to, §§ 727(a)(2)(B), and 727(a)(3), 727(a)(4).[1] The Debtor admits that he omitted assets from his schedules, but contends that he did not have the requisite fraudulent intent because he suffers from attention deficit hyperactivity disorder ("ADHD"), which impairs his working memory. For the reasons set forth below, we **AFFIRM.**

## BACKGROUND

### I.   The Procedural Background

#### A.   The Bankruptcy Proceedings

In February 2010, the Debtor filed a chapter 13 petition, his schedules (the "Initial Schedules"), and a statement of financial affairs. In his Schedule B, the Debtor disclosed that he had only one bank account, a checking account at NESC Federal Credit Union ("NESC") having a balance of $218.00 on the petition date. He did not identify any other bank accounts, nor did he list any accounts receivable. In his Schedule I, he listed income from his employment at Harvard University Department of Education, and self-employment income of $250.00 per month. In his statement of financial affairs, the Debtor stated in response to Question 18 that he had not operated a business in the last five years.

Thereafter, the Debtor converted his case to chapter 7. On May 13, 2010, the Debtor filed amended schedules (the "First Amended Schedules"), and the chapter 7 trustee held a § 341 meeting on June 15, 2010.

On September 14, 2010, Robin Singh Educational Services, Inc., d/b/a TestMasters ("TestMasters"), a creditor holding a

---

1.   Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, 119 Stat. 23, 11 U.S.C. § 101, *et seq.* Unless expressly stated otherwise, all references to "Rule" or "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

state court judgment,[2] conducted a Rule 2004 examination of the Debtor pursuant to a bankruptcy court approved stipulation between the parties. The agreed order required the Debtor to produce all bank records and other bank documents from January 1, 2006, through the date of the request. The Debtor produced only four bank statements—three statements for the NESC account and one statement for a Bank of America checking account. The Debtor testified at his Rule 2004 examination that "I shred everything like that," referring to his bank statements and other financial records. As the Debtor failed to produce all of the requested records, Test-Masters then subpoenaed the Debtor's bank records from NESC, Sovereign Bank, and Bank of America. Shortly thereafter, on September 22, 2010, the Debtor filed his second set of amended schedules (the "Second Amended Schedules").

In November 2010, TestMasters commenced an adversary proceeding: (1) seeking a determination that the state court judgment has a binding, preclusive effect and should be excepted from discharge pursuant to §§ 523(a)(4) and (a)(6); and (2) objecting to the Debtor's discharge pursuant to §§ 727(a)(2)(B), (a)(3), and (a)(4). In his answer to the amended complaint, the Debtor admitted that he had omitted assets from the Initial Schedules and had failed to produce certain documents, but denied that he acted either knowingly and fraudulently, or with the intent to hinder, delay or defraud any

creditor. Discovery ensued, and TestMasters took a deposition of the Debtor on November 10, 2011. On November 22, 2011, the Debtor filed his third set of amended schedules (the "Third Amended Schedules").

The bankruptcy court conducted a two-day trial with respect to the § 727 claims, at which two witnesses testified and numerous exhibits were introduced into evidence. At the close of TestMasters' evidence, the Debtor moved for judgment as a matter of law, which the bankruptcy court denied. At the conclusion of the trial, the bankruptcy court took the matter under advisement and ordered the parties to file post-trial briefs by July 16, 2012.

On July 12, 2012, more than six weeks after the trial was completed, and four days before the deadline for filing post-trial briefs, the Debtor filed an emergency motion to supplement the trial record to include the transcripts of the Debtor's September 14, 2010 Rule 2004 examination and his deposition taken on November 10, 2011, in the adversary proceeding (collectively, the "deposition transcripts"). TestMasters opposed the motion to supplement. On July 16, 2012, the bankruptcy court denied the motion to supplement "for the reasons stated in [TestMasters'] opposition." Thereafter, on July 27, 2012, the Debtor filed his fourth set of amended schedules (the "Fourth Amended Schedules").

On August 27, 2012, the bankruptcy court entered judgment against the Debtor denying his discharge under §§ 727(a)(2)(B), 727(a)(3), and 727(a)(4).[3]

---

2. Prior to the petition date, TestMasters obtained a judgment in the amount of $624,070.24 against the Debtor in a state court proceeding. The judgment, which included interest and attorneys' fees, was entered following a seven-day jury trial in an action TestMasters brought against the Debtor for breach of contract, conversion, and trespass to chattels.

3. The bankruptcy court also held that because it was denying the Debtor's discharge under the § 727 counts, it did not need to make a determination on the remaining two counts under § 523(a)(4) and (a)(6).

In its accompanying memorandum, the bankruptcy court found, among other things, that the Debtor intentionally and fraudulently omitted and undervalued assets on his schedules. In reaching its decision, the bankruptcy court considered the expert testimony regarding the Debtor's ADHD diagnosis, but found that the Debtor was not so impaired that he could not have the requisite fraudulent intent. This appeal followed.

## II. The Evidence in the Bankruptcy Court

The Debtor is well-educated, holding a bachelor's degree, and two master's degrees. At the time of the trial, he was employed at the Harvard Graduate School of Education, where he performed data analysis and provided general technological support through maintenance of the school's website.

### A. Omitted and Undervalued Assets

The bankruptcy court found that the Debtor omitted and/or undervalued numerous assets in the Initial Schedules, that there were numerous discrepancies in his testimony regarding such assets, and that he failed to timely disclose the omitted assets in his subsequent amended schedules. The Debtor does not dispute the bankruptcy court's description of his assets, the various schedule amendments, and the chronology of events related thereto.

### (1) Undervalued NESC account

In his Initial Schedules, the Debtor disclosed only one bank account, an account at NESC having a balance of $218.00 on the petition date. The evidence showed, however, that the balance in the account for the month of February 2010 (when the petition was filed) was never less than $1,823.95. Although the Debtor testified at his Rule 2004 examination in September 2010, a portion of which was read into the trial record, that he believed he had withdrawn monies in person from the NESC account some time between February 1, 2010, and the petition date in order to pay his rent, the NESC bank statement did not show any such withdrawals. Furthermore, the Debtor contradicted his deposition testimony at trial, stating that he never withdrew any monies from the NESC account during that time period.

In addition, the Debtor testified at trial, and the evidence showed, that on March 8, 2010, he wrote a check for $1,700.00 payable to his father, Paul McCarthy, drawn on the NESC account. The bankruptcy court found that, because the Debtor made no deposits into the NESC account between the petition date and March 8, 2010, when he wrote the $1,700.00 check, Test-Masters had established that the account contained more than $218.00 at the time of the bankruptcy filing. It also found that the Debtor had failed to disclose approximately $1,600.00 in the NESC account on the Initial Schedules.

### (2) Undisclosed Sovereign Bank Account

Moreover, when the Debtor filed the Initial Schedules, he had several other bank accounts in addition to the NESC account. Approximately seven weeks before his bankruptcy filing, the Debtor opened a bank account at Sovereign Bank ("Sovereign account") in his father's name. On March 8, 2010, the Debtor deposited the $1,700.00 check drawn from the NESC account into the Sovereign account. In addition, the Debtor made cash deposits of more than $4,500.00 into the Sovereign account within the month preceding his bankruptcy filing. The Debtor admitted at trial that all the transactions pertaining to the Sovereign account, including deposits, checks written, and purchases made, were made by the Debtor for his own

benefit. Although the Debtor used the Sovereign account for his own benefit both prior to and after the bankruptcy filing, he did not disclose its existence on any schedules until he filed the Third Amended Schedules on November 22, 2011, approximately 21 months after the bankruptcy filing, and almost one year after TestMasters commenced its adversary proceeding.

### (3) Undisclosed Bank of America Checking and Savings Accounts

Furthermore, although the Debtor did not disclose any other bank accounts on the Initial Schedules, the evidence showed that he had opened both a checking account and a savings account at Bank of America less than thirty days before his bankruptcy filing. The Debtor used the Bank of America checking account for numerous transactions in the immediate weeks before filing the First Amended Schedules on May 13, 2010. Specifically, the evidence showed that the Debtor used the Bank of America checking account for the direct deposit of his paychecks in April and May 2010, the subsequent withdrawal of those funds for deposit into the Sovereign account in his father's name, the deposit of a $4,000.00 wire transfer from his friend, Trent Teti, on May 5, 2010, and the deposit of $1,500.00 in cash on May 6, 2010. The Debtor also deposited $1,500.00 in cash into the Bank of America savings account on May 6, 2010. Although these transactions took place shortly before he filed the First Amended Schedules, he did not list the Bank of America *checking* account until he filed the Second Amended Schedules, and he did not list the Bank of America *savings* account until he filed the Third Amended Schedules.

### (4) Undisclosed ErgoKomfort Account Receivable

Prior to the bankruptcy filing, the Debtor was owed a $2,500.00 account receivable for website consulting services he performed for a company known as ErgoKomfort. The Debtor did not originally disclose the account receivable on the Initial Schedules, although at his initial § 341 meeting on April 13, 2010, he indicated he owned the receivable. The Debtor testified at his Rule 2004 examination that ErgoKomfort had paid all or almost all of the receivable in the several months immediately preceding his Rule 2004 examination, and that he was no longer billing ErgoKomfort for consulting services. The evidence showed, however, that ErgoKomfort, at the Debtor's direction, issued checks to the Debtor's father, and the Debtor then deposited those funds into the Sovereign account in his father's name. The Debtor did not list the account receivable until he filed the Second Amended Schedules.

### (5) Undisclosed Sole Proprietorship

The Debtor also failed to disclose the existence of a sole proprietorship—a part-time consulting business through which he performed website consulting services for several years prior to the petition date. On Question 18 of his statement of financial affairs, the Debtor was required to disclose all businesses in which he was a "sole proprietor" or was "self-employed" either "full- or part-time within six years immediately preceding" the commencement of a bankruptcy. The Debtor answered "None" in response to Question 18. The Debtor, however, filed federal income tax returns for the years 2007, 2008, and 2009, and included those returns on Schedule C, captioned "Profit or Loss From Business (Sole Proprietorship)." He used the business losses or expenses from his sole proprietorship to reduce his taxable income. The Debtor failed to disclose the existence of his sole proprietorship in any of his schedules or statement of financial affairs.

### (6) Undisclosed Retirement Accounts and Miscellaneous Personal Property

The Debtor did not list on either the Initial Schedules or the First Amended Schedules three separate retirement accounts totaling more than $50,000.00. He did not list the retirement accounts until the Second Amended Schedules, and only after he disclosed them at his Rule 2004 examination. The Debtor also failed to list additional assets, such as his wedding band, which he said he wore at all times, and a copyrighted article titled, "Molecular Technology and the World System," until the Second Amended Schedules.

### B. The Debtor's ADHD Defense

The Debtor did not dispute the omissions and discrepancies established at trial; rather, he asserted that he did not knowingly and intentionally make a false oath or conceal assets, and that he intended to answer questions honestly. The Debtor's defense was based in large part on the fact that he suffers from ADHD. Theresa Cerulli, M.D., a physician specializing in neuropsychiatry, testified at length about ADHD and her clinical diagnosis (which did not take place until 16 months after the bankruptcy filing) that the Debtor suffers from ADHD. Dr. Cerulli testified that the Debtor's ADHD symptoms made it difficult for him to organize, manage, and remember financial information. Although Dr. Cerulli did not have knowledge of specific problems the Debtor may have had completing his schedules, she testified generally that adults with ADHD have problems with working memory, difficulty with taking in information, manipulating it, and that a person with ADHD would struggle to correctly and completely prepare a bankruptcy petition, schedules, and statements. She testified:

> My experience is that this is exactly what untreated ADHD looks like in adulthood, that somebody with ADHD suffers with difficulties and often can appear fine to others and deals with the shame of masking everyday what it's like to look fine medically and to not be cognitively. And it has even more frustration that it carries for them, that their level of intelligence is often high, that they're in quite responsible positions—attorneys, doctors, CEOs, accountants—and yet they fail in the day-to-day things that they need to do in their own life that are this detailed work.

> It does not mean that the person is intentionally trying to deceive or fail. If you look at the circumstances, Tom isn't hiding thousands and thousands and thousands of dollars of assets.

On cross-examination, Dr. Cerulli admitted that "no one can judge someone's intent. . . ." In addition, she admitted that she reviewed the neuropsychological evaluation report prepared by the Massachusetts General Hospital's Psychology Assessment Center,[4] which indicated that the Debtor had a high average to superior baseline level of functioning, that his neuro-cognitive profile was clinically intact across all cognitive domains with the exception of poor sustained intelligence and vigilance. The report also provided: "Of note, an area of mild relative weakness; i.e., in the context of his above-average cognitive baseline was seen in other aspects of attention in executive functioning, although it should be emphasized that those functions were still within normal

4. There is no indication in the record as to when this test was performed or who requested it.

limits clinically." The report also noted that the Debtor's working memory was in the 50th percentile and his arithmetic classification was superior, and noted his ability to super-focus or hyper-focus on certain tasks. Dr. Cerulli dismissed the significance of the report, stating that it was neither objective nor dispositive with respect to an ADHD diagnosis.

## III. The Bankruptcy Court's Decision

The bankruptcy court ultimately denied the Debtor's discharge under §§ 727(a)(2)(B), 727(a)(3), and 727(a)(4).

With respect to the claim under § 727(a)(4), the bankruptcy court stated that:

> TestMasters unequivocally established that the Debtor omitted assets from his original Schedule B, and his First Amended Schedule B, Second Amended Schedule B and Third Amended Schedule B. Specifically, the Court finds that the Debtor failed to list the Sovereign Bank account in his father's name, which he established on January 30, 2010, prior to the commencement of his bankruptcy case, and used as his own. The Court finds that the Debtor knowingly and fraudulently made a false oath relating to a material fact by omitting the Sovereign Bank account, by omitting the Bank of America checking and savings accounts, and by under-reporting the amount of money in the NESC Federal Credit Union account. The Debtor's later admissions simply do not excuse his cavalier disregard for his duty to truthfully and completely disclose his assets. See 11 U.S.C. § 521(a)(1)(B)(i).

In reaching its decision, the bankruptcy court considered the Debtor's argument that he lacked the requisite fraudulent intent because he suffers from ADHD. The bankruptcy court determined, however, that the Debtor's ADHD did not excuse his conduct, stating:

> The Debtor would have this Court excuse his failure to comply with the requirements of the Bankruptcy Code, see 11 U.S.C. § 521(a)(1)(B)(i), and accept that he lacked the requisite fraudulent intent because he suffers from ADHD. The Court unequivocally rejects the Debtor's explanation for his repeated false oaths for a number of reasons. In the first place, Dr. Cerulli testified that although the symptoms of ADHD make it difficult for some individuals to organize, manage, and remember financial information, she could not testify to the Debtor's intent. The Court finds that there was compelling evidence of the Debtor's intent to falsify his list of assets. Second, his protestation of his inability to properly disclose his assets was not credible. The Debtor was able to establish and execute a system enabling him to deposit income in undisclosed accounts and shield prepetition income from the potential reach of TestMasters by having ErgoKomfort issue checks to his father and then depositing those checks into an account in his father's name. That conduct, coupled with his decision to shred bank account statements, undermines any credence this Court would or could give to the Debtor's *postpetition* ADHD diagnosis. The Debtor, faced with a six figure judgment entered on July 28, 2009 and the seizure of his bank account by TestMasters, orchestrated a series of transactions whose purpose could only have been to conceal property from TestMasters. The Debtor, shortly before the commencement of his case, opened checking and savings accounts at Bank of America and, most tellingly, an account at Sovereign Bank in his father's name through which he funneled his pay checks and his account receivable from

ErgoKomfort. The Debtor's testimony was not believable. His evasions and reliance on a poor memory, while consistent with an ADHD diagnosis, were not compelling, particularly where his memory seemed to improve when he was questioned by his counsel. The Court concludes the Debtor's testimony reflected a recent contrivance to avert responsibility for dishonesty, rather than actual incapacity, particularly in view of his marketable computer skills which he conceivably could have used to organize his affairs.

The Debtor may suffer from ADHD, but the Court is not convinced that his condition obviated his ability to understand the concept of perjury and the consequences of perjury when he signed his Schedules and Statement of Financial Affairs under "penalty of perjury." The Debtor is intelligent, has significant computer skills, and has the capability of holding a responsible job at the Harvard Graduate School of Education. The Court does not believe his memory was egregiously impaired because his accomplishments belie this contention. His testimony as to his intentions was incredible and evasive based on this Court's observation of his demeanor during direct and cross-examination. In sum, the totality of the Debtor's conduct establish grounds for the denial of his discharge not only under § 727(a)(4)(A), but under (a)(2)(B) and § 727(a)(3).

With respect to the § 727(a)(2)(B) claim, the bankruptcy court found that "the Debtor unquestionably concealed property of the estate, namely the undisclosed bank accounts and his retirement accounts, after the petition date," and that "[h]is failure to promptly correct Schedule B evidences intent to conceal assets and to hinder and delay TestMasters." Finally, as to the § 727(a)(3) claim, the bankruptcy court determined that, considering "the Debtor's impressive educational credentials, the magnitude of the debt held by TestMasters, the relatively uncomplicated state of his financial affairs, and his demeanor as a witness," the Debtor's failure to preserve books and records warranted denial of his discharge.

## JURISDICTION

Before addressing the merits of an appeal, we must determine that we have jurisdiction, even if the issue is not raised by the litigants. *See Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.)*, 226 B.R. 724 (1st Cir. BAP 1998). We have jurisdiction to hear appeals from: (1) final judgments, orders and decrees; or (2) with leave of court, from certain interlocutory orders. 28 U.S.C. § 158(a); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *id.* at 646 (citations and internal quotation marks omitted), whereas an interlocutory order " 'only decides some intervening matter pertaining to the cause, and ... requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.' " *Id.* (quoting *In re Am. Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir.1985)). A bankruptcy court's judgment denying a debtor's discharge under § 727 is a final order. *Cox v. Villani (In re Villani)*, 478 B.R. 51, 58 (1st Cir. BAP 2012) (citations omitted); *Gagne v. Fessenden (In re Gagne)*, 394 B.R. 219, 224 (1st Cir. BAP 2008) (citation omitted). Accordingly, we have jurisdiction to hear this appeal.

## STANDARD OF REVIEW

A bankruptcy court's findings of fact are reviewed under the clearly errone-

ous standard and conclusions of law are reviewed *de novo*. *See Lessard v. Wilton–Lyndeborough Coop. Sch. Dist.*, 592 F.3d 267, 269 (1st Cir.2010). The bankruptcy court's decision whether to grant a discharge poses a mixed question of law and fact, which we review for clear error unless the bankruptcy court's analysis was based on a mistaken view of the legal principles involved. *Gannett v. Carp (In re Carp)*, 340 F.3d 15, 22 & 24 (1st Cir. 2003) (citations omitted). Whether a debtor possessed the requisite intent for purposes of § 727 is a "question of fact, subject to the clearly erroneous standard of review." *Warchol v. Barry (In re Barry)*, 451 B.R. 654, 658 (1st Cir. BAP 2011) (citations and internal quotation marks omitted). Under the clear error standard, the trier's findings of fact and the conclusions drawn therefrom ought not to be set aside "unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made." *In re Carp*, 340 F.3d at 22 (citation and internal quotation marks omitted). Thus, "if the bankruptcy court's findings are supportable on any reasonable view of the record, we are bound to uphold them." *Id.* (citations omitted). Deference to the bankruptcy court's factual findings is particularly appropriate on the intent issue "[b]ecause a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 137 (1st Cir.1992).

### DISCUSSION

■■■■■ Section 727 provides that the bankruptcy court must grant a discharge to a chapter 7 debtor unless one or more of the enumerated grounds for denial of a discharge exist. 11 U.S.C. § 727. "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy

Code's fresh start policy." *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir.1997) (internal quotation marks and citations omitted). However, "the very purpose of certain sections of the law, like [§ 727(a)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Id.* (internal quotation marks omitted).

The bankruptcy court denied the Debtor's discharge under § 727(a)(2)(B), and § 727(a)(3), and § 727(a)(4), although its decision focused primarily upon § 727(a)(4). The Debtor argues that the bankruptcy court made clearly erroneous factual findings, including some of those upon which it based its assessment of his credibility. He also contends that, in light of the uncontroverted evidence that he suffers from attention deficit issues, the bankruptcy court should not have inferred fraudulent intent without direct evidence of his intent.

### I. Section 727(a)(4)—False Oath or Account

■■■■■ Under § 727(a)(4)(A), the bankruptcy court can deny a discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." 11 U.S.C. § 727(a)(4). It is well settled in the First Circuit that to prevail on a claim under § 727(a)(4), the plaintiff must prove that: (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact. *In re Carp*, 340 F.3d at 25 (citing *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987)). The "burden of proof rests with the [plaintiff], . . . but 'once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the of-

fense charged.' " *In re Tully,* 818 F.2d at 110 (citations omitted).

### A. False Oath

The Debtor admits that in the Initial Schedules he omitted or undervalued several assets including: (1) a Bank of America account; (2) a Sovereign Bank account in the name of his father, Paul McCarthy; (3) $1,824.30 in his NESC account on the petition date; (4) a collection of miscellaneous property; (5) a registered copyright; (6) a $2,500.00 account receivable owed to Debtor by ErgoKomfort; and (7) three qualified retirement plans. Thus, there is no issue as to whether the Debtor made a false oath for purposes of § 727(a)(4). The Debtor argues, however, that TestMasters did not prove by a preponderance of the evidence that he possessed the fraudulent intent, and that the false oaths were not material in this case.

### B. Made knowingly and fraudulently

■■■■■ Under § 727(a)(4), "[t]he existence of false or inaccurate statements is not, in and of itself, sufficient cause to deny a debtor's discharge unless it is shown that these were knowingly and fraudulently made." *Premier Capital, Inc. v. Diamond (In re Diamond),* 106 Fed.Appx. 73, 78 (1st Cir.2004) (citations and internal quotation marks omitted). The intent required by § 727(a)(4)(A) is satisfied by a showing of reckless disregard for the truth. *Vasiliades v. Dwyer,* No. 05–10479–FDS, 2006 WL 1494081, at *16 (D.Mass. May 23, 2006); *see also In re Tully,* 818 F.2d at 112 (acknowledging that "reckless disregard to the truth" has "consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)."). Even though courts will not construe an ignorant or inadvertent omission as evidence of fraudulent intent, reckless disregard may nonetheless be found based on the "cumulative effect of a series of innocent mistakes." *Discenza v. MacDonald (In re MacDonald),* 50 B.R. 255, 259 (Bankr.D.Mass.1985). Moreover, because a debtor rarely gives direct evidence of fraudulent intent, intent to defraud a creditor may be established by circumstantial evidence or inferred from a course of conduct. *Desmond v. Varrasso (In re Varrasso),* 37 F.3d 760, 764 (1st Cir.1994); *Dotson v. Cogswell (In re Cogswell),* 462 B.R. 28, 33 (Bankr.D.Mass.2012); *Saunders Real Estate Corp. v. Pearlman (In re Pearlman),* 413 B.R. 27, 34 (Bankr. D.R.I.2009) (citing *Marrama v. Citizens Bank of Mass. (In re Marrama),* 445 F.3d 518, 522 (1st Cir.2006)).

■■■■ The bankruptcy court found, based on the documentary evidence and testimony presented at trial, that the Debtor engaged in a deceptive pattern of fraud or reckless indifference to the truth. The bankruptcy court's finding is supported by the record. First, the Debtor failed to disclose the existence of three bank accounts, including the Sovereign account in his father's name, all of which he actively used in the days before and after his bankruptcy filing. The Debtor did not disclose the Sovereign account in his father's name until approximately 21 months after the petition date and only after he had already amended his schedules twice. Second, the Debtor understated the balance of the NESC account, and then, after the bankruptcy filing, he took funds from that account and deposited them into the undisclosed Sovereign account in his father's name that he used for his own benefit. Third, the Debtor initially failed to disclose the pre-petition account receivable due from ErgoKomfort, which was ultimately made payable to his father and deposited post-petition into the undisclosed Sovereign account in his father's name. Fourth, the Debtor failed to disclose a

website management sole proprietorship, the business losses or expenses from which the Debtor used to reduce his taxable income. Fifth, the Debtor failed to disclose three retirement accounts with a combined value of more than $50,000.00. Sixth, the Debtor gave untruthful responses to direct inquiries by the trustee and TestMasters' counsel at § 341 meetings, his Rule 2004 examination, and his deposition in the adversary proceeding. Seventh, the Debtor made untimely and incomplete disclosures in his multiple amendments to his schedules, and only after TestMasters pursued third-party subpoenas to prove that the Debtor's testimony and his prior disclosures were untruthful or incomplete and directly contradicted his prior sworn testimony. From the foregoing pattern of misstatements and omissions, the bankruptcy court inferred that the Debtor acted with either fraudulent intent or reckless disregard for the truth. Such a finding is supported by the record and, therefore, is not clearly erroneous.

█ Despite the foregoing evidence, the Debtor argues that he lacked the requisite fraudulent intent because he suffers from ADHD, which impairs his working memory. Although a debtor's honest confusion or lack of understanding may weigh against an inference of fraudulent intent, see *Angell v. Williams (In re Williams)*, No. 08–188, 2010 WL 364459, at *6 (Bankr.E.D.N.C. Jan. 27, 2010) (citing *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 484 (E.D.Va.1997)), the bankruptcy court did not believe the Debtor's claims of innocence, and unequivocally rejected his explanation for his inability to properly disclose his assets. Noting that Dr. Cerulli could not testify as to the Debtor's specific intent, the bankruptcy court found that there was compelling evidence (as set forth above) of his intent to falsify his assets. The bankruptcy court

also found that the Debtor's explanation for his repeated false oaths was not credible. According to the bankruptcy court, the Debtor's conduct belied his protestation of innocence. Significantly, none of the Debtor's supposed lapses of memory or judgment operated against his selfish interests—despite his ADHD, the Debtor was able to establish and execute a system enabling him to deposit income in undisclosed accounts and shield pre-petition income from the potential reach of creditors. Thus, the bankruptcy court did not believe that his memory was egregiously impaired, finding instead that his testimony as to his intent was "incredible and evasive" and "reflected a recent contrivance to avert responsibility for dishonesty, rather than actual incapacity." Giving due deference to the bankruptcy court's unique opportunity to assess the Debtor's credibility and demeanor, *see Hannigan v. White (In re Hannigan)*, 409 F.3d 480, 482 (1st Cir. 2005) (citing *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)); *In re Carp*, 340 F.3d at 25 (citing *In re Burgess*, 955 F.2d at 137), we conclude that the bankruptcy court's findings regarding the Debtor's fraudulent intent were supported by the record and, therefore, were not clearly erroneous.

### C. Materiality

█ The Debtor also argues that the bankruptcy court should not have denied his discharge under § 727(a)(4) as the false oaths were not material. For purposes of § 727(a)(4), a debtor's statement is materially related to the bankruptcy case if it " 'bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property.' " *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829, 839 (1st Cir. BAP 2011) (quoting *Commonwealth of*

*Mass. v. Sohmer (In re Sohmer)*, 434 B.R. 234, 250 (Bankr.D.Mass.2010) (citations omitted)). "Courts have acknowledged that 'the threshold to materiality is fairly low.'" *Id.* (citations omitted).

▮▮▮▮ Generally, the status of bank accounts and interests in business all bear a relationship to the debtor's estate. *Buckeye Retirement Co., LLC v. Bullough (In re Bullough)*, 358 B.R. 261, 283 (Bankr.N.D.Tex.2007) (citations omitted). "Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the detail of the debtor's finances." *Id.* (citations omitted). In addition, a debtor cannot claim that he omitted an asset because it had little or no value. Debtors have an absolute duty to report all assets "even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *Wood v. Premier Capital, Inc. (In re Wood)*, 291 B.R. 219, 226 (1st Cir. BAP 2003). Thus, a debtor cannot escape the consequences of § 727(a)(4)(A) by asserting that a bank account contains little or no money. *In re Sohmer*, 434 B.R. at 253 (stating that even if there is little or no money in bank accounts on petition date, debtor had duty to disclose existence of accounts); *Fitzgerald v. Gorman (In re Gorman)*, Adv. Pro. No. 08–1296, 2010 WL 3724775, *6, 2010 Bankr.LEXIS 3249, *18 (Bankr.D.Mass. Sept. 15, 2010) (holding that failure to disclose business interest in accounts was material even if they had no value). As the First Circuit stated, "valuation is not really the point." *In re Tully*, 818 F.2d at 111 n. 4. "Matters are material if pertinent to the discovery of assets, including the history of a bankrupt's financial transactions ... [so that] knowing and fraudulent omission of a bank account ... warrants

the denial of the discharge." *Id.* (internal quotation marks and citations omitted).

▮▮▮▮ Here, the Debtor failed to disclose the existence of three bank accounts on his Initial Schedules and in subsequent amendments, and he undervalued the one he did disclose. He also failed to disclose other business interests and assets such as his sole proprietorship and his retirement accounts. The Debtor's omissions in this case were material even if the assets he failed to disclose had little or no value.

### D. Conclusion

For the reasons set forth above, we conclude that the bankruptcy court did not err in finding that the Debtor knowingly and fraudulently made a false oath relating to a material fact, warranting denial of his discharge. As we are affirming the denial of the Debtor's discharge under § 727(a)(4), we need not address issues raised under § 727(a)(2)(B) and § 727(a)(3).

### II. Denial of Motion to Supplement the Record

The Debtor argues that the bankruptcy court's refusal to allow him to supplement the trial record with transcripts of his Rule 2004 examination and deposition was an abuse of discretion. As a preliminary matter, this matter is not properly before us as the Debtor never appealed from the bankruptcy court's order denying his motion to supplement the record. Moreover, even if we were to consider this issue, the Debtor would not prevail.

▮▮▮▮ It is well established that a trial court's decision with respect to a motion to supplement the trial record is committed to the sound discretion of the trial court, and should be reversed only if the court abuses that discretion. *See Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.)*, 304

F.3d 410, 433 n. 43 (5th Cir.2002) (citations omitted). Here, the evidence shows that the subject transcripts, although identified as exhibits, were not formally admitted into evidence at the trial before the bankruptcy court. The Debtor was given ample opportunity to present his case, and his counsel could have introduced or attempted to introduce any and all portions of the deposition transcripts, portions of which TestMasters used to impeach the Debtor. Yet, he decided not to introduce such transcripts into evidence or to question the Debtor about them. Rather, he waited more than six weeks, until a few days before post-trial briefs were due, to file his motion to supplement the record. If the bankruptcy court allowed the motion, Test-Masters would have been prejudiced as it would not have had an opportunity to cross-examine the Debtor regarding the testimony contained in the subject transcripts. Based on the foregoing, the bankruptcy court's denial of the motion to supplement was well within its discretion.

The Debtor argues that there was some confusion in the way TestMasters "numbered and introduced exhibits into evidence" which made it difficult to ascertain which exhibits actually became part of the record. He does not, however, point to any particular part of the record that supports his argument. In addition, he never raised the issue of his purported confusion at trial or as grounds for his motion to supplement. Thus, he cannot prevail on such an argument here.

### CONCLUSION

For the reasons set forth above, we conclude that the bankruptcy court did not err in denying the Debtor's discharge pursuant to § 723(a)(4) and, therefore, we **AFFIRM**.