50 F.3d 1
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
IN RE Andrew J. LANE Debtor. Peter H. McCallion, Frank
Loomis, Gregory O'Neill, William Fowler, Richard
Delorenzo, Appellants,
v.
Andrew J. LANE, Appellee.
 No. 94-1991
 United States Court of Appeals,
First Circuit.
 Mar. 20, 1995
 
 Appeal from the United States District Court for the District of Massachusetts [Hon. Nathaniel M. Gorton, U.S. District Judge ]
 Kenneth J. Parsigian and Goodwin Proctor & Hoar argued for appellant; Peter H. McCallion was on brief pro se.
 Charles R. Dougherty with whom Sara Miron Bloom and Hill & Barlow were on brief for appellee.
 D.Md.
 AFFIRMED.
 Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 In this bankruptcy appeal, we again review issues arising from a dispute between plaintiffs- appellants ("appellants"), who were the former shareholders of Indian Hill Associates, Inc. ("Indian Hill"), and defendant- appellee Andrew J. Lane ("Lane") over the sale of all Indian Hill shares to Lane. Indian Hill's sole asset was a contract to purchase 165 acres of land in New York's Westchester and Putnam counties ("the Land"). Originally, appellants sought a constructive trust on Lane's Chapter 11 estate and a determination that Lane's indebtedness to appellants is nondischargeable under various subsections of Sec. 523 of the Bankruptcy Code, 11 U.S.C. Sec. 523. On our initial review, we upheld the bankruptcy court's dismissal as to all of appellants' claims except the one arising under Sec. 523(a)(2)(A).[1] In re Lane, 937 F.2d 694 (1st Cir. 1991) ("Lane I "). On remand, the bankruptcy court conducted a one-day trial and held that the debt owed appellants did not fall under this dischargeability exception. On review, the district court affirmed. After careful review, we now affirm.
 
 I.
 
 2
 This dispute has lingered for more than seven years, generating an intricate factual background. We cull only those facts relevant to this appeal. In 1987, appellants formed Indian Hill to acquire the Land. Through its treasurer, Terence Gargan, Indian Hill executed a contract under which it agreed to purchase the Land from Putnam Limited Partners ("Putnam") for $3,425,000. Indian Hill placed a deposit of $300,000 in escrow and closing was set for November 4, 1987.
 
 
 3
 Appellants, one of whom is a lawyer, wanted to develop the Land. Critically, however, they were short on both money and experience in land development, inadequacies that became obvious as events unfolded. Indian Hill's president, appellant Peter H. McCallion, approached Lane, an experienced Massachusetts-based developer, about a joint residential development on the Land. Lane rejected that proposal but indicated that, if financing was available, he would consider purchasing the entire tract from Indian Hill. McCallion said that he would help secure financing. Negotiations ensued and eventually the parties reached a tentative agreement under which Lane would buy all outstanding Indian Hill shares for $1,675,000, thereby acquiring all of Indian Hill's rights under the land-purchase contract. In October 1987, Indian Hill sent Lane a draft agreement to that effect.
 
 
 4
 Meanwhile, McCallion arranged for a meeting between Lane and Bankers Trust Company in Manhattan. At the meeting, held on November 3, 1987, and attended by Lane, McCallion, and their associates, Lane's prospects for financing appeared good, but not certain. However, McCallion and the other Indian Hill shareholders faced an imminent problem: their closing with Putnam was scheduled for the next day and, with no financing to complete the purchase, the $300,000 deposit was at risk. Immediately following the Bankers Trust meeting, Lane, McCallion, and others in their group adjourned to a nearby restaurant. McCallion indicated that he could secure an extension of the closing date if Lane signed a contract to acquire Indian Hill's shares. Lane testified that he made clear that he would not go through with the project unless financing was available. With financing, however, the deal presented an attractive opportunity for Lane, and prospects for a substantial profit for the Indian Hill shareholders. Eventually, during the course of the restaurant meeting, Lane and McCallion signed an agreement ("November 3rd agreement") for sale of Indian Hill's shares to Lane.
 
 
 5
 The terms of the November 3rd agreement required Lane to pay a $300,000 deposit into escrow upon signing the agreement, $75,000 on November 4, 1987, three additional installments of $350,000 each, and a final installment of $250,000. There was no financing contingency. Lane did not have his checkbook with him in New York but said that he would send the deposit check by mail.
 
 
 6
 With the agreement in hand, McCallion secured from Putnam an extension of the closing date until January 4, 1988. Lane, however, never sent the deposit check. McCallion pressed Lane for the deposit. On November 30, 1987, Lane sent a letter to appellants proposing to amend the November 3rd agreement by making Lane's obligation expressly contingent upon financing. The new closing deadline loomed and, on January 4, 1988, the Indian Hill shareholders and Lane agreed to amend the November 3rd agreement ("January 4th amendment"). The basic terms of the January 4th amendment provided: (1) Indian Hill's original deposit would be released to Putnam, thereby supporting a further extension of the closing until February 12, 1988; (2) payments on the original $1,675,000 share sale price were made expressly conditional on Lane securing financing; (3) a payment schedule was established under which the final two installments, totalling $600,000, were made conditional on Lane securing governmental approval for residential development, and; (4) appellants agreed to "forever release and will bring no claims against Lane arising or alledged [sic] to arise" from the November 3rd agreement.
 
 
 7
 Pursuant to the January 4th amendment, Lane secured a bridge loan and paid appellants $375,000 (representing the $300,000 down payment plus the $75,000 that had been due on November 4, 1987), and Indian Hill's original $300,000 deposit was released to Putnam. Bankers Trust approved financing for Lane. In August 1988, Lane paid appellants an additional installment of $350,000, plus interest. A dispute then arose regarding zoning of the Land and, as a result, Lane made no further payments and filed suit in New York state court charging appellants with misrepresenting or failing to disclose facts about the Land. Appellants counterclaimed and ultimately secured a judgment against Lane for $468,313.[2] For reasons apparently unrelated to the Indian Hill dispute, Lane filed a Chapter 11 bankruptcy petition in March 1989.[3]
 
 
 8
 In the end, appellants more than doubled their original investment, receiving $785,000 in payments from Lane. In October 1989, appellants began this adversary bankruptcy proceeding seeking to determine the dischargeability of, alternatively, the balance of the installments, which totalled $950,000 plus interest, or the amount of the state court judgment, $468,313.
 
 II.
 
 9
 Bankruptcy Rule 8013 provides that the court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." We review conclusions of law de novo. In re G.S.F. Corp., 938 F.2d 1467, 1474 (1st Cir. 1991). In an appeal from a district court review of a bankruptcy court order, we independently review the bankruptcy court's decision. See, e.g., In re Winthrop Old Farm Nurseries, Inc., ___ F.3d ___ (1st Cir. 1995).
 
 
 10
 Appellants' theory under Sec. 523(a)(2)(A) is that Lane acquired title to the Indian Hill shares by promising, under the November 3rd agreement, to pay the $300,000 down payment to the appellants without ever having the intent to do so. To establish a claim under this subsection, appellants must prove: (1) that Lane made representations; (2) that at the time he knew were false; (3) that he made them with the intent and purpose of deceiving the appellants; (4) that the appellants relied on such representations; and (5) that the appellants sustained the alleged loss and damage as the proximate result of the representations having been made.[4] See, e.g., In re Ophaug, 827 F.2d 340, 342 n.1 (8th Cir. 1987).
 
 
 11
 A misrepresentation of intention can constitute fraud. See, e.g., In re Zachary, 147 B.R. 881, 883 (Bankr. N.D. Tex. 1992) (citing 3 Collier on Bankruptcy p 523.08 at 523-54 (15th ed. 1991)). If a debtor enters into a contract with the intent not to comply with its terms and later defaults under the contract, the contract may provide a basis for an exception to discharge on the grounds of fraud if the other remaining elements are established. In re Krause, 114 B.R. 582, 606 (Bankr. N.D. Ind. 1988). However, mere failure to perform is not sufficient evidence of scienter nor is subsequent conduct contrary to the original representation necessarily indicative of fraudulent intent. In re Zachary, 147 B.R. at 883 (collecting cases).
 
 
 12
 The bankruptcy court found that Lane did not misrepresent his intent. The court found that Lane "at all times informed the [appellants] of the necessity that he obtain complete financing for the project. He intended to perform the agreement which he believed he had with the [appellants]." Thus, the court held that appellants' debt did not fall under the Sec. 523(a)(2)(A) dischargeability exception. Alternatively, the court held that, by the terms of the January 4th amendment, appellants had released Lane from all claims arising from the November 3rd agreement.[5]
 
 
 13
 Appellants raise numerous arguments challenging the bankruptcy court's conclusion, most of which have little bearing on the issue before us. Indeed, appellants appear to misapprehend fundamentally the issue on appeal: we must determine whether the bankruptcy court, after a full trial, committed clear error in its factual finding that Lane did not misrepresent his intent when he entered into the November 3rd agreement.[6] Because the issue is intent, appellants must point to evidence, direct or circumstantial, of Lane's state of mind sufficient to overcome the court's finding. Instead, appellants offer arguments grounded in parol evidence and substantive contract rules. These arguments may be material to the legal effect of the November 3rd agreement and the January 4th amendment, but they have no relevance to the issue of Lane's intent to misrepresent.[7]
 
 
 14
 Appellants do make a lame pass at a state-of-mind argument by averring that Lane's fraudulent intent is evident from his general conduct. Specifically, they refer to a pattern of seemingly inconsistent statements, alleging that, "Lane consistently makes up stories to suit his purposes without regard for the truth." They also point to Lane's general conduct subsequent to the November 3rd agreement, focusing particularly on his failure to attempt to secure the necessary government approval for the development, which was a precondition for payment to appellants of the last two installments.
 
 
 15
 Appellants' argument falls far short of establishing clear error. With regard to Lane's statements, the trial record reveals that appellants made strenuous efforts to impeach Lane's testimony. In reaching its conclusion, the court simply made a credibility determination by choosing to believe Lane, a decision to which we accord deference. As to Lane's post-November 3rd conduct, the record contains ample evidence corroborating the court's conclusion that Lane's intent in signing the agreement was clear from the beginning: that is, it was merely an accommodation to facilitate the extension of the November 4, 1987 closing date and that his performance of the agreement was contingent upon securing financing. Most significantly, Lane not only reiterated his position regarding financing in his November 30, 1987 letter, but he also performed as promised by paying the disputed down payment after he secured financing. In the end, after the benefit of testimony from the principal players in this dispute, the bankruptcy court determined that appellants had failed to carry their burden of establishing the elements required for the Sec. 523(a)(2)(A) exception to apply. Upon our own review of the record, we find ample support for the bankruptcy court's finding.
 
 III.
 
 16
 As we noted in Lane I, appellants took a credit risk by surrendering their interests in Indian Hill in return for Lane's unsecured promise to pay. Lane I, 937 F.2d at 699. Unfortunately for them, bankruptcy intervened. Because we find no clear error with respect to the court's determination that Lane had no intent to misrepresent, Sec. 523(a)(2)(A) does not apply to appellants' claim, and this litigation is finally brought to an end. Accordingly, the decision of the bankruptcy court is
 
 
 17
 affirmed. Costs to appellee.
 
 
 
 [1]
 Section 523(a)(2)(A) provides that money, property, services, or an extension, renewal, or refinancing of credit is not discharged to the extent it is obtained by: "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."
 
 
 [2]
 The state court dismissed the claims against all appellants except McCallion
 
 
 [3]
 Lane and his companies were among the largest real estate developers in New England. According to the record in this case, at one point Lane's assets totalled $90 million. Lane filed his bankruptcy petition on the same day the New York state court awarded appellants their judgment
 
 
 [4]
 As we noted in our earlier decision in this case, whether appellants must prove reasonable reliance is an open question in this court. Lane I, 937 F.2d at 698 n.8. As we do not reach the issue in this case, we continue to take no position in the matter
 
 
 [5]
 Because we resolve this case under Sec. 523(a)(2)(A), we do not reach the issue of the enforceability of the release contained in the January 4th amendment
 
 
 [6]
 We note that in their reply brief, appellants do correctly state the issue before the court, but then launch into an extended discussion of issues wholly extraneous to the question of intent, including res judicata, parol evidence, and substantive contract law
 
 
 [7]
 At oral argument, appellants offered a new theory. Seizing on language contained in In re Krause, 114 B.R. 582, 606 (Bankr. N.D. Ind. 1988), a case cited by the panel in Lane I, and which we cite above, supra at 8, appellants argue that fraud occurred because Lane never intended to comply with the contract's terms. They argue that the bankruptcy court erred by failing to analyze Lane's intent to comply with the terms of the November 3rd contract, which purports to be fully integrated, and thus cannot incorporate any parol agreement regarding financing. On this record, we do not agree. As discussed more fully below, Lane could not have the intent to misrepresent when, as the court found, he repeatedly made clear that the agreement was expressly conditioned on securing financing, the legal effect of the underlying document notwithstanding. We think the court was correct to look to Lane's statements to appellants as direct evidence of his intent to comply with the "terms" that he announced, rather than to infer fraud from the fact that those "terms" may have had no legal effect under the language of the contract