Karen A. BRADY–ZELL, Debtor.

Danielle E. deBenedictis,
Plaintiff–Appellant,

v.

Karen A. Brady–Zell, Defendant–
Appellee.

BAP NO. MB 13–019.
Bankruptcy No. 10–10922–FJB.
Adversary No. 10–01119–FJB.

United States Bankruptcy Appellate Panel
for the First Circuit.

Oct. 24, 2013.

Danielle E. deBenedictis, Esq., Pro Se, on brief for Appellant.

Logan A. Weinkauf, Esq., on brief for Appellee.

Before LAMOUTTE, HAINES, and DEASY, United States Bankruptcy Appellate Panel Judges.

LAMOUTTE, Bankruptcy Judge.

Attorney Danielle E. deBenedictis ("deBenedictis") appeals the bankruptcy court's judgment in favor of Karen A. Brady–Zell ("Brady–Zell") on her complaint seeking to except from discharge a debt for legal fees incurred during her representation of Brady–Zell in a pre-petition divorce proceeding. After a trial on the merits, the bankruptcy court determined that deBenedictis had not met her burden of proving Brady–Zell's fraudulent intent, and, therefore, that the debt was not excepted from discharge under § 523(a)(2)(A).[1] As deBenedictis has not shown the bankruptcy court's decision to be a result of clear error, we **AFFIRM** the judgment.

### BACKGROUND [2]

deBenedictis is a practicing attorney specializing in domestic relations law and custody matters. In October 2007, Brady–Zell contacted deBenedictis seeking her representation as replacement counsel in a divorce proceeding. At that time, Brady–Zell's husband was challenging the validity of their marriage, asserting that Brady–Zell had not been properly divorced from her first husband in the Dominican Republic. If true, Brady–Zell's second marriage would be void, and she would not be entitled to alimony or distribution of her husband's considerable assets. In light of these allegations, the probate court entered an order affording Brady–Zell an opportunity to engage counsel to refute

---

1. Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, *et seq.*

2. The following is an overview of the facts giving rise to this appeal. Unless otherwise noted, the facts are taken from the bankruptcy court's decision and the appellate record.

these claims, and ordered her husband to pay $25,000.00 to her attorney for legal representation.

deBenedictis agreed to represent Brady–Zell and, as a retainer, accepted and received the $25,000.00 that Brady–Zell's husband was required to advance on her behalf. Brady–Zell and deBenedictis had no written retention agreement, but in a letter dated October 10, 2007, deBenedictis memorialized the terms on which they agreed as follows:

> This will also confirm that I have agreed to represent you in the above entitled matter [the then-pending divorce action] and to do all that is possible to avoid your Husband from establishing that your marriage to him is not legally valid. I will accept the $25,000 which Judge Smoot ordered advanced to you by your Husband as a retainer and will bill you at $400 per hour against this retainer. As we discussed I will wait to be paid for the remainder of my services until the matter has been concluded as you have represented that you will not have any further funds until that time.

Although Brady–Zell later denied receiving this letter and claimed that she understood the $25,000.00 payment to be a flat fee or cap, the bankruptcy court found Brady–Zell's testimony to be incredible and that the parties agreed that deBenedictis would work and be paid at the rate of $400.00 per hour, that the first $25,000.00 of her fees and expenses would be covered by the retainer, and that she would wait to be paid for the remainder of her services until the divorce action was concluded.

deBenedictis performed legal services on Brady–Zell's behalf from October 2007 through January 2008. It is undisputed that the scope of deBenedictis' representation far exceeded what either of them had expected at the time deBenedictis was hired. deBenedictis testified that the di-

vorce case presented novel and difficult issues of divorce, criminal, and immigration law. Although the case became "paramount and all consuming" for two months, Brady–Zell and her husband reconciled in December 2007, and the divorce action was dismissed in January 2008.

On January 23, 2008, deBenedictis sent Brady–Zell a bill for legal services in the amount of $87,432.54, against which she credited the $25,000.00 retainer, leaving a balance of $62,432.54. In the bill, deBenedictis accounted in detail for her time, and billed $80,040.00 for 200.1 hours of time, plus $5,000.00 for monies she advanced to counsel in the Dominican Republic, and $2,392.54 for other fees and expenses. Prior to this bill, deBenedictis had not sent Brady–Zell any billing statements documenting her hours and fees as they accrued.

Although Brady–Zell praised deBenedictis for the work performed and made repeated assurances that she was trying to make arrangements to pay the sizeable bill, she never paid any of the balance. Eventually, in March 2009, deBenedictis sued Brady–Zell in state court to collect the fee. In Brady–Zell's response to deBenedictis' motion for a real estate attachment, Brady–Zell, for the first time, argued that the legal fees were excessive and not fully earned, and that they had agreed on a flat fee payment of $25,000.00.

In January 2010, Brady–Zell filed a chapter 7 petition, which stayed the state court action. Thereafter, deBenedictis filed an adversary complaint asserting, among other things, that the outstanding debt for legal fees was nondischargeable under § 523(a)(2)(A) as a debt arising from a false representation and false pretenses. deBenedictis contended that Brady–Zell made a promise to pay any fees and expenses incurred in excess of the $25,000.00 retainer, and that she made this promise

without intending to honor it. She also argued that Brady–Zell later made repeated assurances of payment, thereby inducing deBenedictis to work long hours on the divorce proceeding and accrue significant legal fees. Brady–Zell denied making any such promise at all, contending that they agreed on a flat fee of $25,000.00. She also argued that because she did not receive periodic billing statements, she did not know that the $25,000.00 retainer had been exhausted or how large deBenedictis' fees would eventually be and, therefore, she could not have formed the requisite intent to not pay deBenedictis' bill.

After a two-day trial, at which both Brady–Zell and deBenedictis testified, the bankruptcy court entered a judgment dismissing the adversary complaint on its merits and discharging the debt. In its written decision, the bankruptcy court determined that deBenedictis did not meet her burden of establishing that Brady–Zell did not intend to honor her promise to pay when she initially made that promise. It also determined that deBenedictis did not establish that Brady–Zell lacked intent to pay at any time during the accrual of deBenedictis' fees. As a result, the bankruptcy court held that the debt was not excepted from discharge under § 523(a)(2)(A).[3]

In making this determination, the court made some important factual findings. First, it found that deBenedictis' October 2007 letter accurately memorialized the parties' fee agreement that deBenedictis would work and be paid at the rate of $400.00 per hour, that the first $25,000.00 of her fees and expenses would be covered by the retainer, and that she would wait to be paid the remainder of her services until the divorce action was concluded. The bankruptcy court found that Brady–Zell's later assertion that she understood the $25,000.00 to be a flat fee or cap was not credible. The bankruptcy court also found that both parties agreed that if the divorce proceeding ended in a judgment of divorce, the balance of deBenedictis' fees (in excess of the initial $25,000.00 retainer), if any, would be paid from the marital estate by operation of an award contained in the divorce judgment. The bankruptcy court found that there was no evidence, however, that the parties agreed to a specific source of funds for the payment of deBenedictis' fees in the event the parties reconciled. The bankruptcy court also rejected Brady–Zell's claims that deBenedictis' fees were excessive and not fully earned, finding that Brady–Zell was "keenly aware of the scope of the effort her case presented" and that, notwithstanding the lack of periodic statements, she could not have been surprised that deBenedictis' hours reached 200 and that total bill greatly exceeded $25,000.00.

The bankruptcy court then went on to apply the applicable law to these factual findings. It noted that Brady–Zell did, as alleged, promise to pay deBenedictis for all of her services. It noted, however, that the more difficult question was whether, when Brady–Zell made this promise of payment, she intended to honor it. The bankruptcy court noted that the burden was on deBenedictis to prove falsity—that, at the time she hired deBenedictis, Brady–Zell never intended to pay anything more than the $25,000.00 retainer.

The bankruptcy court determined that although Brady–Zell was not credible in

---

**3.** Although deBenedictis also asserted a claim under § 523(a)(15) in her complaint, she admitted at trial that that section was not applicable to the debt at issue. Moreover, although deBenedictis raised § 523(a)(6) at trial, she made no mention of that section in her proposed findings or her closing arguments. Thus, the bankruptcy court limited its findings and conclusions to the allegations brought under § 523(a)(2)(A).

her claims, deBenedictis had not met her burden of proving falsity by a preponderance of the evidence. As the bankruptcy court stated:

> Brady–Zell has by no means proven that she did intend to honor her promise. She was in almost every respect not credible in her testimony, and the evidence showed her to be capable of misrepresentations in important matters. The evidence shows that, at least when she retained deBenedictis, she had resources, equity in two condominiums, with which to fund payment of the fees. Her own representations to deBenedictis shortly after the fees became due suggested that her husband was intent on helping to get this debt paid. She offered no testimony or other explanation as to why, in view of her indications to deBenedictis that payment of this debt was a priority, this debt did not get paid. Her further contention, that she did not know, at the time of the promise or indeed at any later time, that the bill might exceed $25,000 is also not credible. If the burden were on Brady–Zell, she would lose. I certainly cannot find that she has acquitted herself of the alleged misrepresentation.
>
> However, the burden is not on Brady–Zell. Rather, the burden is on deBenedictis to prove falsity by a preponderance of the evidence, and though the question is a close one, the evidence does not preponderate in her favor. First, deBenedictis testified that, after the representation was undertaken, the scope of her duties grew well beyond what either of them had anticipated. I do not know what either of them anticipated at the outset, but doubt on that issue must be resolved against deBenedictis. Second, there was at least some evidence of changed circumstances between the commencement of representation and the date when payment first became due. Mr. Zell had paid out approximately $145,000 on attorney's fees—$120,000 for himself and $25,000 for Brady–Zell—and both were facing substantial additional fees. There was evidence that Mr. Zell was facing health issues. And 2008 was not, on the whole, a propitious year for property values. I do not know whether these circumstances account for the nonpayment of the fee.
>
> Had the evidence shown that, in 2008, Brady–Zell had the ability to pay this debt, I could conclude that nonpayment was evidence of that the promise of payment was made without intent to pay. DeBenedictis did not attempt to show that in 2008, Brady–Zell had the ability to pay this debt: that she continued to have equity in the condos; that, notwithstanding her husband's co-ownership of these properties in tenancies by the entirety, she could borrow against or liquidate them; or that she had other options for paying the debt. The burden of exploring these issues, if they figured into deBenedictis' theory of the case at all, was on her. Lacking evidence on these issues, Brady–Zell's ability to pay remains uncertain, not a reliable basis for a finding that she never intended to pay.

Recognizing the difficulty of establishing lack of intent to honor a promise, the bankruptcy court determined that the totality of the circumstances was "inconclusive, with the weight of the evidence split about even." It noted, however, that the law "requires a preponderance, a tipping of the balance in favor of the plaintiff." As the balance did not tip in favor of deBenedictis, the bankruptcy court resolved the issue in favor of Brady–Zell. Having found that deBenedictis did not sustain her burden as to the falsity of the promise, the

bankruptcy court did not address the remaining elements under § 523(a)(2)(A).

This appeal followed.

## JURISDICTION

Before addressing the merits of an appeal, we must determine that we have jurisdiction, even if the issue is not raised by the litigants. *See Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.),* 226 B.R. 724, 725–26 (1st Cir. BAP 1998). We have jurisdiction to hear appeals from: (1) final judgments, orders, and decrees; or (2) with leave of court, from certain interlocutory orders. 28 U.S.C. § 158(a); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.),* 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *id.* at 646 (citations omitted), whereas an interlocutory order " 'only decides some intervening matter pertaining to the cause, and [ ... ] requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.' " *Id.* (quoting *In re Am. Colonial Broad. Corp.,* 758 F.2d 794, 801 (1st Cir.1985)). A bankruptcy court's determination regarding the dischargeability of a debtor's obligations under § 523(a)(2) is a final appealable order. *See Blacksmith Invs., Inc. v. Woodford (In re Woodford),* 418 B.R. 644, 649 (1st Cir. BAP 2009); *Werthen v. Werthen (In re Werthen),* 282 B.R. 553, 555–56 (1st Cir. BAP 2002), *aff'd,* 329 F.3d 269 (1st Cir.2003). Accordingly, we have jurisdiction to hear this appeal.

## STANDARD OF REVIEW

Appellate courts apply the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law. *See Rockwood v. SKF USA Inc.,* 687 F.3d 1, 10 (1st Cir.2012) (citation omitted). A bankruptcy court's determination of whether a requisite element of a nondischargeability claim under § 523(a)(2) is present is a factual determination which we review for clear error. *See Douglas v. Kosinski (In re Kosinski),* 424 B.R. 599, 607 (1st Cir. BAP 2010) (citing, among others, *Lentz v. Spadoni (In re Spadoni),* 316 F.3d 56, 58 (1st Cir.2003); *Palmacci v. Umpierrez,* 121 F.3d 781, 785 (1st Cir.1997)). A finding is clearly erroneous when, although there is evidence to support it, "the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.' " *Hannigan v. White (In re Hannigan),* 409 F.3d 480, 482 (1st Cir. 2005) (quoting *Anderson v. Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). If the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse, even if convinced that if it were sitting as a trier of fact, it would have weighed the evidence differently. *Chase v. Harris (In re Harris),* 385 B.R. 802, 804 (1st Cir. BAP 2008) (citation omitted).

## DISCUSSION

Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). The First Circuit established that, in order to exclude a debt from discharge because it was obtained by a false representation, a creditor must establish the following elements:

(1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;

(2) the debtor intended to deceive;

(3) the debtor intended to induce the creditor to rely upon the false statement;

(4) the creditor actually relied upon the misrepresentation;

(5) the creditor's reliance was justifiable; and

(6) the reliance upon the false statement caused damage.

*Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 66 (1st Cir.2012) (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir.2001)).

■ The first two elements of this test describe the conduct and scienter required to show the debtor's fraudulent conduct generally, and the last four elements embody the requirement that the creditor's claim must arise as a direct result of the debtor's fraud. *In re Spigel*, 260 F.3d at 32. The standard of proof of each element for a § 523 claim is by a preponderance of the evidence, and the burden of proof on each element lies with the party contesting the dischargeability of a particular debt. *Palmacci*, 121 F.3d at 787 (citations omitted).

■ With respect to the first element, the First Circuit stated that the concept of a false representation includes a misrepresentation as to one's intention, such as a promise to act. *Id.* at 786 (citation omitted). As the First Circuit explained:

A representation of the maker's own intention to do ... a particular thing is fraudulent if he does not have that intention at the time he makes the representation.... [A] promise made without the intent to perform it is held to be a sufficient basis for an action of deceit. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. This is true even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.

The test may be stated as follows. If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Id.* at 786–87 (footnotes omitted) (citations omitted) (internal quotation marks omitted).

■ Thus, "if a debtor enters into a contract with the intent not to pay, the contract may provide a basis for an exception to discharge on the grounds of fraud if the other remaining elements are established." *Bellas Pavers, LLC v. Stewart (In re Stewart)*, BAP No. MB 12–017, 2012 WL 5189048, at *8, 2012 Bankr.LEXIS 4943, at *22–23 (1st Cir. BAP Oct. 18, 2012). However, a debtor's " 'mere failure to perform is not sufficient evidence of scienter nor is subsequent conduct contrary to the original representation necessarily indicative of fraudulent intent.' " *Id.* at *8, 2012 Bankr.LEXIS 4943, at *23 (quoting *Fowler v. Lane (In re Lane)*, 50 F.3d 1, 1995 WL 115751, at *3, 1995 U.S.App. LEXIS 5510, at *8–9 (1st Cir. Mar. 20, 1995)). As a debtor will rarely, if ever, admit to acting with an intent to deceive, the court may infer fraudulent intent from the totality of the circumstances. *Palmacci*, 121 F.3d at 789.

As the party seeking to prevent Brady–Zell from discharging her debt, the burden was on deBenedictis to show that Brady–Zell's debt came squarely within an exception from discharge. As noted above, the bankruptcy court found that deBenedictis failed to provide sufficient evidence that, at the time Brady–Zell hired her, Brady–Zell did not intend to honor her promise to pay all of deBenedictis' legal fees in excess of the initial $25,000.00 retainer. Clearly, there is no direct proof of Brady–Zell's state of mind at the time she hired deBenedictis.

deBenedictis argues, however, that the bankruptcy court should have inferred Brady–Zell's fraudulent intent from the totality of the circumstances. According to deBenedictis, the evidence shows that at the time Brady–Zell hired her, Brady–Zell intended not to pay anything more than the $25,000.00 retainer advanced by her husband under a state court order. deBenedictis contends that Brady–Zell has shown herself in testimony to be dishonest, denying all responsibility for the balance due, which deBenedictis construes as proof that Brady–Zell never intended to honor her promise of payment. According to deBenedictis, the fact that Brady–Zell testified at trial that they had a flat fee arrangement proves that she never intended to pay more than the $25,000.00 retainer. And, deBenedictis argues, the fact that the bankruptcy court found that the contract between the parties was not a flat fee retainer, and rejected the veracity of Brady–Zell's testimony, "mandates a conclusion that deBenedictis has met her burden of proof of fraudulent intent."

Although the bankruptcy court found that Brady–Zell lacked credibility in her testimony at trial, that alone was not enough to establish fraudulent intent at the time she made the promise to pay. The bankruptcy court determined that it simply could not find fraudulent intent because the totality of circumstances was "inconclusive, with the weight of the evidence split about even," and the law requires "a preponderance, a tipping of the balance in favor of [deBenedictis]." According to the bankruptcy court, there was insufficient evidence as to Brady–Zell's intent *at the time she hired deBenedictis.*

There is evidence that at the time she hired deBenedictis, Brady–Zell had no income or other financial resources of her own with which to pay for an attorney and that deBenedictis knew and agreed that any fees in excess of the $25,000.00 retainer would have to wait until the divorce became final. The bankruptcy court found that deBenedictis agreed to take a $25,000.00 retainer from Zell's husband and that deBenedictis agreed that any additional fees would have to be paid from a future division of marital assets. deBenedictis does not dispute those findings. As the bankruptcy court stated: "Both parties anticipated, and agreed, that if the divorce proceeding ended in a judgment of divorce, the balance of deBenedictis' fees, if any, would be paid from the marital estate by operation of an award contained in the divorce judgment." There was no evidence, however, that the parties agreed on a specific source of funds for payment in the event the parties reconciled and no property settlement was reached. Brady–Zell's later contention that they had agreed on a flat fee payment arrangement does not itself prove fraudulent intent at the time she hired deBenedictis. Rather, it appears that Brady–Zell made those assertions as a justification for her later failure to pay. Thus, the totality of the circumstances does not show that Brady–Zell had the requisite intent to defraud deBenedictis at the time she hired her.

Moreover, Brady–Zell's subsequent conduct does not establish her fraudulent in-

tent at the time she hired deBenedictis. Although she failed to pay deBenedictis' bill after the completion of the representation, there is insufficient evidence in the record that her lack of payment was based on a prior intention from the beginning not to pay. After she reconciled with her husband, Brady–Zell told deBenedictis that she was working on a way to pay the legal bill, but that the economy was bad and there was no equity available in her property that would allow for a refinancing. Even if Brady–Zell subsequently decided not to pay deBenedictis, this does not establish a false representation at the time she hired deBenedictis. *Palmacci*, 121 F.3d at 787 (stating that if debtor intended to perform at time he made promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made).

■ Thus, we conclude that the bankruptcy court did not err by not inferring fraudulent intent from the totality of the circumstances. As the bankruptcy court's account of the evidence is plausible in light of the record, we may not reverse its finding. *Hannigan*, 409 F.3d at 482; *see also Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 311 (1st Cir.2003) ("When a trial court chooses between two plausible but conflicting interpretations of the evidence, its choice cannot be clearly erroneous.") (footnote omitted) (citation omitted).

deBenedictis also argues that the bankruptcy court erred by ruling that she had to prove that Brady–Zell had the means to pay her debt at the time she hired deBenedictis in order to meet her burden of proof under § 523(a)(2)(A). According to deBenedictis, there are no Bankruptcy Code provisions or reported decisions that require a creditor to prove not only that the debtor did not intend to pay at the time she promised to do so, but also that the debtor had the means to do so. deBen-

edictis misinterprets the bankruptcy court's statements in this regard. The bankruptcy court stated that if the evidence had shown that, in 2008, Brady–Zell had the ability to pay this debt, it could then conclude that nonpayment was evidence that the promise of payment was made without intent to pay. Because there was no such evidence, Brady–Zell's ability to pay was uncertain, and, therefore, it was "not a reliable basis for a finding that she never intended to pay." Moreover, the bankruptcy court's decision was not based upon whether Brady–Zell had the ability to pay; rather, it turned on deBenedictis' failure to present sufficient evidence of Brady–Zell's fraudulent intent at the time she hired deBenedictis.

■ deBenedictis also argues that the debt owed to her is nondischargeable because, during the course of the representation, Brady–Zell made repeated false assurances of payment, thereby inducing deBenedictis to continue working long hours on the divorce proceeding and accrue significant legal fees. As the United States Court of Appeals for the First Circuit noted, a false representation which gives rise to a nondischargeable debt is not just one that the debtor makes to induce a party to enter a contract—a debtor can make a false representation during the course of performance that induces forbearance or continued performance by the other party. *See In re Goguen*, 691 F.3d at 69. Not only did deBenedictis fail to pinpoint any specific point in time during the course of performance when such a representation was made, she failed to introduce any proof of a false representation that Brady–Zell made during the course of her representation that induced deBenedictis' continued performance. That deBenedictis did not send periodic billing statements reflecting the accruing legal fees highlights this lack of communication.

Thus, the bankruptcy court did not err in finding that deBenedictis failed to meet her burden of establishing that Brady–Zell made a false representation during the course of the representation.

## CONCLUSION

For the reasons set forth above, we conclude that the bankruptcy court did not make any clearly erroneous findings of facts or manifest errors of law when entering judgment in Brady–Zell's favor. Therefore, we **AFFIRM**.