Mary L. Smith, Debtor.

Kathleen WHITCOMB and Scott Whitcomb, Plaintiffs–Appellees,

v.

Mary L. SMITH, Defendant–Appellant.

BAP NO. MB 16–044
Bankruptcy Case No. 15–10891–MSH
Adversary Proceeding No. 15–01079–MSH

United States Bankruptcy Appellate Panel of the First Circuit.

September 6, 2017

Daniel K. Webster, Esq., on brief for Defendant–Appellant.

Kathleen Whitcomb and Scott Whitcomb, pro se, on brief for Plaintiffs–Appellees.

Before Deasy, Cary, and Fagone, United States Bankruptcy Appellate Panel Judges.

Cary, U.S. Bankruptcy Appellate Panel Judge.

Mary L. Smith ("Ms. Smith") appeals from a bankruptcy court judgment in favor of Kathleen Whitcomb and Scott Whitcomb (collectively, the "Whitcombs"), wherein the bankruptcy court: (1) determined that the state court judgment debt Ms. Smith owes the Whitcombs is excepted from discharge pursuant to § 523(a)(6) and § 523(a)(2)(A); [1] and (2) granted the Whitcombs relief from the automatic stay in order to return to the state court to enforce that judgment, as amended (the "Amended State Court Judgment"). For the reasons set forth below, the bankruptcy court's judgment is **AFFIRMED.**

---

1. Unless otherwise indicated, the terms "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended.

## BACKGROUND [2]

### I. Pre–Litigation Events

This appeal arises out of a dispute concerning ownership of certain property located in Hanover, Massachusetts (the "Property"). Ms. Smith and her late husband, William Smith ("Mr. Smith"), acquired the Property in the 1960s, and their daughter, Kathleen Whitcomb ("Kathleen"), grew up there. After she married, Kathleen moved to Rockland, Massachusetts, where she lived with her husband, Scott Whitcomb ("Scott"), and their children for 13 years.

In 1999, concerns about Mr. Smith's health and his long-term care surfaced, as Mr. Smith displayed memory difficulties. This development prompted the Smiths to suggest that the Whitcomb family move into the home on the Property. More specifically, the Smiths proposed to build a new in-law addition for themselves, while the Whitcombs would occupy the main house. The Whitcombs would pay for the construction of the addition (including making the monthly payments on any mortgage loan obtained by the Smiths to build the addition), pay a portion of the real estate taxes, utilities, maintenance costs, and other expenses associated with the Property, and eventually receive title to the Property from the Smiths.

Although they had been considering the purchase of a new-construction home in Rockland, the Whitcombs agreed to the Smiths' proposal. In order to memorialize the families' joint understanding, Mr. Smith prepared a handwritten, two-page agreement, captioned "Agreement between William H. and Mary L. Smith and Scott H. and Kathleen A. Whitcomb relative to [the Property]" (the "Agreement"). Neither the Whitcombs nor the Smiths signed the Agreement.

The first paragraph of that document expressed the reason for the Agreement as follows: "Because of a strong desire to keep the [Property] in the family due to its excellent location, we have entered into an agreement with our daughter, Kathleen A. Whitcomb and her husband, Scott H. Whitcomb ...." The Agreement was silent regarding any concerns pertaining to Mr. Smith's health that might have inspired the new living arrangement.

With respect to the Whitcombs' responsibilities, the Agreement provided that, "[insofar] as possible," the Whitcombs would "pay for the cost of th[e] addition in toto including any costs associated with additions to the [P]roperty as required by state or municipalities because of the addition." Additionally, the Agreement provided:

> *Transfer of the entire property* from William H. and Mary L. Smith to Scott and Kathleen Whitcomb *will be made by legal means* that will minimize the tax exposure to Scott and Kathleen Whitcomb.

> [ ] Regardless of circumstances, the rights of William H. and Mary L. Smith to abide in the addition as the[ir] home will not be denied or restricted until either

> (i) Both are deceased [or]

> (ii) Each decides to leave on their own volition ....

**2.** The facts set forth herein are extracted largely from the bankruptcy court's Memorandum of Decision entered on July 12, 2016 (the "Decision"), the Joint Concise Statement of the Material Facts of Record filed in the above-referenced adversary proceeding, and the state court's Findings of Fact, Rulings of Law and Order for Judgment (the "State Court Judgment") issued on August 5, 2014, and are supplemented with information gleaned from the record.

(emphasis added). The Agreement did not specify exactly when the Smiths would "transfer ... the entire [P]roperty" to the Whitcombs.

The Agreement went on to summarize the "Approximate Financial Details" of the parties' arrangement, including estimates for the cost of the addition ($150,000) and the Smiths' expected resulting mortgage balance ($120,000). Lastly, the Agreement contained a provision titled "Gift Tax Exposure," which stated, in relevant part, that the "estimated gift amount from William H. and Mary L. Smith to Scott H. and Kathleen L. Whitcomb is $423,000 less $150,000 or $273,000." This provision further stated that a "method of transfer of this asset amount that will minimize the net tax exposure to Scott and Kathleen Whitcomb will be sought."

In May 1999, an appraiser estimated the fair market value of the Property to be $270,000. The Smiths retained a general contractor who agreed to build the addition for an estimated price of $138,000. The final cost of construction, however, exceeded $170,000. Most of the work was financed with the proceeds of a $120,000 mortgage loan that the Smiths obtained from South Shore Savings Bank in June 1999. In July 2000, the Whitcombs paid the Smiths $33,000 (from the sale of their Rockland home) to help cover the remaining costs of construction. The Whitcombs also agreed to pay an additional $10,615 in improvements from their own savings. The remaining funds came from a new $80,000 line of credit obtained by the Smiths.

Although title to the Property remained in the Smiths' names, the Whitcombs agreed to assume full responsibility for the monthly payments on the Smiths' $120,000 mortgage loan with South Shore Savings Bank. The intention was that when the Whitcombs received title to the Property in accordance with the Agreement, they would refinance the mortgage loan in their own names.

In 2000, construction was completed, and the Smiths moved into the addition and the Whitcombs—having sold their Rockland home—moved into the main house. For the first few years, the parties lived together harmoniously, with the Whitcombs making the monthly mortgage payments and paying their share of taxes and utilities. Meanwhile, however, the Smiths had not conveyed title to them. The Whitcombs did not press the matter, believing that the Smiths would eventually deliver the deed as agreed.

After several years, the relationship between the Whitcombs and the Smiths soured. Although the record is unclear precisely when or why, it reveals a number of stressors. According to Kathleen, at some point, Ms. Smith complained that "things were getting expensive, and she wanted [the Whitcombs] to give her more money [per] month and that she would then just pay everything that way."[3] "So she came up with a calculation and raised the amount" of the Whitcombs' payments. When Ms. Smith demanded that the Whitcombs, who had been paying the banks and utility companies directly, pay her $600 weekly, they complied.

In 2004 or 2005, the children of one of the Smiths' sons came to live in the house on the Property—one child with the Whitcombs and one child with the Smiths—when their parents died unexpectedly. This development put additional stress on the two families. Additionally, during this period, Mr. Smith, who had been diagnosed

---

**3.** The record is vague about when this development occurred, but it appears to be some-time after 2004.

with symptoms of cognitive deterioration in 1995, began presenting symptoms of Alzheimer's disease which would eventually lead to his death in 2011. Ms. Smith became concerned about her financial future.

Meanwhile, the debt on the Property steadily increased, through the Smiths' repeated refinancings or home equity loans. The Whitcombs were unaware of all of the details concerning each of these transactions. But when the Smiths did inform them, the Whitcombs would suggest to the Smiths that it would be an opportune time for the Smiths to transfer title to the Property as they had agreed years earlier.

The Smiths' additional loans increased the financial burden on the Whitcombs. As the financial demands upon the Whitcombs increased and the Smiths (primarily Ms. Smith) continued to avoid their obligation to transfer title to the Property, the discord between the families mounted. Their relationship suffered an irreparable breakdown in mid-to-late 2008 and early 2009. Matters seemed to come to a head in the fall of 2008 during a heated family argument. Following that argument, Ms. Smith declared "that the house was getting too expensive and that it was time to sell it." A letter from the Smiths' attorney and a six-month occupancy agreement followed, effectively notifying the Whitcombs that they would have to vacate the Property on or before June 30, 2009. Apprehensive that they could be evicted at any moment, the Whitcombs moved out of the Property in February or March 2009—approximately nine years after they had moved in.

## II. State Court Proceedings

Later in 2009, the Whitcombs sued the Smiths in state court to enforce their rights under the Agreement.[4] After all efforts to resolve the families' dispute failed, a three-day bench trial ensued. This trial resulted in the entry of the State Court Judgment in August 2014. There, the state court ruled in favor of the Whitcombs, concluding that a "binding, enforceable contract" existed between the parties, as "the evidence demonstrate[d] that they agreed on the material terms . . . and that they had the present intention to be bound by those terms." The state court further found the parties contemplated that "a transfer would be made, if not immediately, then certainly within a reasonable time after the Whitcombs moved onto the Property." The state court based this finding on the fundamental principle of contract law permitting a court to "imply a reasonable time" when "no time for performance is set out in the contract . . . ." In addition, the state court reasoned that this finding was "consistent with, and [ ] supported by, Mr. Smith's contemporaneous notes concerning the transaction," in which he queried: "Ownership—do they [ (i.e., the Whitcombs) ] understand gradual ownership?" Indeed, the state court opined that in selling their Rockland home and moving onto the Property, the Whitcombs "reasonably relied upon the terms" of the Agreement, "including the Smiths' explicit promise ultimately to transfer ownership of the Property to the Whitcombs."

The state court additionally found that the Whitcombs had "substantially performed their obligations" under the Agreement, and that Ms. Smith, on the other hand, had "materially breached" the Agreement by, among other things, "steadfastly refusing to transfer title to the Property to the Whitcombs and by effec-

---

4. The state court complaint is not included in the record on appeal. The record reflects, however, that after Mr. Smith passed away in 2011, Ms. Smith was the sole remaining defendant in the state court action.

tively evicting" them. Moreover, the state court determined that the Whitcombs' version of events giving rise to the dispute was "decidedly more persuasive," and that Ms. Smith's testimony that the Whitcombs failed to make mortgage and utility payments was "inconsistent with the documentary evidence and otherwise not credible." Additionally, the state court rejected Ms. Smith's assertion at trial that she did not see the Agreement until 2009 and that she never agreed to be bound by its terms. In support, the state court pointed to Ms. Smith's original counterclaim, where she alleged: "The intention of the parties in July of 1999 and thereafter was that if the Whitcombs fulfilled their obligation to pay for the addition of the in-law apartment and paid their share of costs associated with their portion of the house then and only then would the Smiths deed them an interest in the [P]roperty."

The state court additionally found that the Whitcombs established by a preponderance of the evidence that from approximately June 2000 to late 2008, they paid to the Smiths $149,729.54, consisting of the following: (a) a $33,000.00 cash contribution for addition construction; (b) $10,615.00 in direct payments to the general contractor; (c) $14,560.00 for other improvements to the Property; (d) $36,675.00 in direct mortgage payments by check; (e) $11,784.54 in mortgage and expense payments to Ms. Smith; (f) $23,400.00 in mortgage and expense payments to Mr. Smith; and (g) $3,413.00 in direct payments to utilities. The state court concluded, "[w]hile their performance may not have been perfect in every respect, the Whitcombs, by and large, made the payments called for in the [ ] Agreement from 2000 through 2008 ... in accordance with the varying wishes and instructions of the Smiths." The state court elaborated: "To the extent that the Whitcombs may have failed to make some small percentage of the payments owed, or may have failed to make some small percentage of the payments owed in a timely manner, such failures were not material in the circumstances."

Although the state court made no finding as to whether Ms. Smith acted with fraudulent intent or with willful and malicious intent to injure the Whitcombs, it did find that Ms. Smith's "continuing failure to transfer the Property to the Whitcombs [was] driven, in significant part, by her interest in extracting the available equity from the Property for her own use through a series of mortgage refinancings and new home equity loans." According to the state court, these transactions "netted Mrs. Smith more than $175,000[ ] since 2003, and ... increased the outstanding mortgage balance on the Property from approximately $120,000 in 2000 to approximately $410,000 ...."

The state court ordered Ms. Smith to perform her obligation under the Agreement to convey title to the Property to the Whitcombs. The Whitcombs subsequently moved for limited relief from the State Court Judgment, due to difficulties they encountered in attempting to implement that judgment. The court granted their motion in part, reasoning that the State Court Judgment:

f[ell] short of its stated goal on at least two counts, those being that: (1) it is not reasonably possible for the Whitcombs to obtain a mortgage loan and acquire title to the Property following the procedures prescribed in the current Judgment; and (2) the current Judgment unfairly imposes on the Whitcombs, and correspondingly unfairly relieves Mrs. Smith of, the significant additional financial burden placed on the Property by Mrs. Smith's numerous home equity loan refinancings.

8

Accordingly, on January 20, 2015, the state court entered the Amended State Court Judgment, thereby modifying the procedures for transferring title to the Property. Although it recognized that "no court order ... [could] make either side whole," the state court sought "to achieve a resolution that more closely and equitably approximate[d] the intended result ...." Thus, the Amended State Court Judgment specifically provided, in pertinent part, that:

(a) Ms. Smith would "cause a quitclaim deed to be recorded ... that add[ed] both of the Whitcombs to the title to the" Property "as co-owners in fee simple for no consideration";

(b) "Prior to adding the Whitcombs to the title to the Property," Ms. Smith would "take all steps reasonably necessary to obtain the consent of any and all lenders" to the change in title;

(c) Ms. Smith would be permitted to reside in the addition;

(d) Ms. Smith would be responsible for all payments due on her current first mortgage regardless of whether she continued to reside on the Property;

(e) So long as Ms. Smith lives on the Property, she shall pay the Whitcombs 27% of the non-loan occupancy costs (e.g., utilities, home owners insurance, and taxes) in addition to the mortgage loan payments;

(f) Within 365 days of the recording of the quitclaim deed, the Whitcombs would apply for and close on a refinance loan in an amount sufficient to pay off both of the existing mortgage loans; and

(g) After Ms. Smith conveyed her right, title, and interest in the Property to the Whitcombs and so long as Ms. Smith continues thereafter to reside on the Property, Ms. Smith shall pay to the Whitcombs a specified amount in month-

ly rent in addition to her share of the non-loan occupancy costs.

As an alternative to the specific performance remedy, the state court ordered that the Whitcombs could, within 435 days from the date of the Amended State Court Judgment, elect an award of money damages against Ms. Smith in the amount of $270,000. In that case, they would be required to vacate the Property and divest themselves of any interest in the Property in favor of Ms. Smith.

Neither party appealed the Amended State Court Judgment and the Whitcombs received assurances that Ms. Smith would comply with it.

## III. Bankruptcy Court Proceedings

Instead, fewer than three months later, on March 12, 2015, Ms. Smith filed a petition for chapter 7 relief. She continues to reside on the Property and to hold title.

On her Schedule F, Ms. Smith listed the Whitcombs as holding an unsecured nonpriority claim in the amount of $270,000. She also filed a Notice of Intent to reaffirm the two mortgages on the Property.

On March 18, 2015, the Whitcombs filed in the bankruptcy court an Emergency Motion for Leave to Record Amended Judgment, which the bankruptcy court allowed. Thereafter, the Whitcombs recorded a certified copy of the Amended State Court Judgment in the land records.

## IV. The Adversary Proceeding

In May 2015, the Whitcombs commenced an adversary proceeding against Ms. Smith with a four-count complaint. The bankruptcy court scheduled a trial on Count IV (the Whitcombs' § 523(a)(6) claim) for June 22, 2016, as all other

counts had been previously resolved.[5] The sole issue at trial was whether Ms. Smith's obligation to the Whitcombs was excepted from discharge because that obligation resulted from a willful and malicious injury by Ms. Smith to the Whitcombs.

At trial, the Whitcombs appeared, pro se, and Ms. Smith appeared, represented by counsel. Each of the Whitcombs testified on their own behalf. Counsel for Ms. Smith called his client and Patricia Thomas, another of the Smiths' children, to testify.

The following excerpts from Kathleen's testimony on direct examination effectively capture the Whitcombs' theory of the case:

[O]ur case is to show how Mrs. Smith ... hurt us and damaged us. So we agreed to do an in-law apartment with them where a piece of paper was written out, which we all do agree that my father wrote. It's the first exhibit. And we gave them the $33,000. We went to get the mortgage. Mrs. Smith refused to do it, and I believe her intent was never to follow through with this agreement that we had. So right from the get go, she was never going to do it.

We lived in Rockland. We owned our own home. We sold it. We moved in there, put all our money into it. Everything was great for the first three, four years .... We had no problems. She didn't want to do the [A]greement. We didn't want to make her unhappy. She wanted to have a home equity. She told me it was about $25-, $30,000, which I found out later, through her mortgage statements, she had an 80,000—dollar home equity, which she ... took out right off the bat.

So we never knew about that money, ever. The second time that she refi-

nanced, we did know about that one. She told us she was going to refinance her home equity because it was going to double the interest rates. So we said that was fine. It makes perfect sense, asked about going on the deed because now we were about three to four years out of—yes, we were making her mortgage payments, but we needed—the bank just said to us, if you're on the deed, it'll be easier for you to get a mortgage. We were still thinking we were going to get a mortgage for the 120–, which was agreed. And my father and I went to the bank, spoke to the lawyer, and the lawyer said when ... they went in to refinance, they could just put us on the deed.

When they came back from that, she did not put us on the deed. She did refinance. I don't know—did not know what her amount of money was at the time. I didn't ask. I just figured she just took her home equity and refinanced it. But what she did was another mortgage with another whole different home equity that we knew—I didn't know anything about the amounts. She never told us the amounts.

Kathleen continued:

So as far as I'm concerned, that was harming us because the home was supposed to be our lifetime investment. We put everything we had into it, and she was borrowing, borrowing, borrowing but never telling us. And every time there was an increase, we did pay the increases.

. . . .

[T]he work that was done to that home was done by my husband. He brought the value up so she was able to continue

**5.** In the proceedings below, the Whitcombs never invoked the doctrine of issue preclusion or otherwise asserted that they were entitled to judgment because Ms. Smith was collaterally estopped from contesting her liability under § 523(a)(6).

to borrow, and she did it—not every time without our knowledge. The amounts were without our knowledge. And one was definitely without our knowledge.

As we're sitting there still asking her to put us on the deed so we can go get a mortgage for 120—even though we had been paying, we were still going to get the 120—because that was the agreement. So that was severe harm that she caused to us because it was making the house unreachable, but we didn't know it at the time, because, again, she was my mother, and I believed her.

. . . .

I think I explained that, you know, the harm, and it was willful because we never knew about it. She never—and the funny thing is, is we talked all the time about everything. Never mentioned these types of monies. I did bring up going on the deed, and she never turned to me and well, you know, this is what's owed, so forth and so forth. So I just feel that was willfully done.

. . . .

So another thing that ... started happening was—she never said that she was unhappy with us being there, but Scott did a lot of work to that house, a lot of sweat equity. And every time he did something, she complained about it, constantly, like for days.

. . . .

So my position is she never intended to honor the [A]greement. We discussed it for well over a year. She refinanced behind our backs. There w[as] a lot of nitpicking, petty stuff that went on constantly, the eviction notice.

. . . .

We were all of a sudden turned into renters.

About 2007, I think, she said you're no longer—you can get the house when we pass away, but you're not going to get it now. You're now going to be a renter, so we started writing rent on our checks.

. . . .

And that's why, when we got the eviction notice, we figured she's calling us renters, so that's what we became. She controlled the whole show, had it her way, and now we live in a tiny little two-bedroom apartment.

Although title to the Property remained unchanged, Kathleen testified, she never kept a record of the payments they gave her mother or asked for copies of the bills that they were required to pay. Kathleen testified that she "trusted her [mother] a hundred percent."

Scott's testimony was brief by comparison. He testified, in pertinent part:

Things were working, and then things just started, you know, falling apart.

I do believe it started [in 2006] when Andrew Smith [ (the Smith's grandson) ] started to move in, and that's when things started getting a little fishy, I thought.

Ms. Smith's testimony followed. On direct examination, she testified that she was 81 years old, that she formerly worked in various medical facilities, that she was married to Mr. Smith for 54 years, until his death in 2011, and that she and her husband had purchased the Property in 1969. When asked about the "basis of the [A]greement," she responded: "[M]y husband and I [ ] did not want to move. I loved the house we were in, and it was paid for in full in 1994."

Ms. Smith acknowledged the state court's ruling that she and her husband had breached the Agreement. Yet her testimony was inconsistent and evasive on the issue of whether she ever intended to

transfer the Property to the Whitcombs. During direct examination, when her attorney first asked Ms. Smith to explain her understanding of the Agreement, Ms. Smith did not mention a word regarding the contemplated transfer. She stated only that "an addition would be built on the existing structure." Asked whether the parties contemplated that the Whitcombs would be added to the title of the Property, she answered: "Well, no." When her lawyer later asked whether there was "ever any discussion about Mr. and Mrs. Whitcomb becoming owners of the [P]roperty if they ... fulfilled certain obligations," she responded: "Correct." She further testified on direct examination that the Whitcombs "had to ... earn it." When later asked if she was "aware" in 2003 that the Whitcombs "wanted to come on the deed," Ms. Smith replied: "Correct." But she also expressed that she had "some concerns," because a number of the Whitcombs' checks had been returned for insufficient funds. She attempted to further justify her concerns by explaining that both Kathleen and Scott had experienced medical issues which resulted in periods of unemployment.

Kathleen repeatedly asked her mother on cross-examination whether she intended to honor her commitment to transfer title to the Property. The first time, Ms. Smith's answer was evasive and non-responsive. This prompted the trial court to ask: "You never really intended to put the Whitcombs on the deed?" Ms. Smith responded: "Absolutely, that is false. We would have put them on the deed if they did three things." Kathleen again pressed her mother regarding her intention to convey title, asking: "The house would be ours ... and that was the deal. ... [B]ut you were never going to do that?" Ms. Smith answered: "That's not true. You could never get a mortgage." Kathleen then asked her mother at least three more

times whether she intended to honor her commitment to transfer the Property, and, to the extent that Ms. Smith's replies were responsive, she answered in the affirmative. And, finally, after Kathleen read the entire Agreement on the record, the court interjected: "[W]ere you going to honor it?" Ms. Smith answered: "[Y]es, we were going to honor it."

Ms. Smith's testimony contained other inconsistencies, as well. For example, while she claimed that the Whitcombs "never" took care of Mr. Smith, she also testified that the parties had a "good" relationship "for the first few years" of their living arrangement. She also denied having knowledge of any effort to evict the Whitcombs from the Property and denied ever having seen the eviction notice of December 2008. Significantly, she testified that in 2007, the Smiths "ran out of money."

Patricia Thomas testified that the Smiths' financial condition deteriorated. She explained that after 2004, her mother frequently expressed concerns to her regarding the escalating cost of maintaining the Property. She then testified concerning the role her father's health played in the events following 2004 and the general tension in the family:

> Well, there was the fact that he was unable to like keep track anymore ... so when he retired, he used to go upstairs at his desk. And he was—he would mathematically model the stock market, and he would do that like daily. ... [B]ut he couldn't do it at some point in time. So he was—you know, he was keeping stock that he should have sold. And it was just going, you know, down. So ... eventually, because the stock market, crashed, it was just all gone.

When asked to explain why her parents refinanced in 2007, she replied: "[J]ust to pay bills, basically." She then recounted

that in 2007, "things were going downhill," family members "kind of played off everybody against each other," and then tensions erupted in a "huge fight" in September or October 2008. After that fight, the parties "liv[ed] next door to each other [although] nobody was speaking."

After taking the matter under advisement, the bankruptcy court issued the Decision, see Whitcomb v. Smith (In re Smith), 555 B.R. 96 (Bankr. D. Mass. 2016), which included the following Findings of Fact, among others:

(1) "[T]he Smiths, through repeated re-financings or additional home equity loans, steadily increased the debt on the [P]roperty";

(2) "Ms. Smith consistently stalled and no transfer occurred";

(3) "The superior court's final order established liability against Ms. Smith, determined that the Whitcombs' version of the underlying events was 'decidedly more persuasive,' and stated that Ms. Smith's testimony as to the Whitcombs['] failure to make mortgage and utility payments 'was inconsistent with the documentary evidence and otherwise not credible.'"

(4) "Apart from the Whitcombs being obligated to make mortgage and utility payments, the [ ] [A]greement was silent as to any of the other conditions identified by Ms. Smith."

(5) "As for their obligation to make mortgage and utility payments, the record establishes ... that the Whitcombs faithfully performed that obligation despite impediments interposed by the Smiths as they repeatedly refinanced their mortgage to increase the mortgage debt thereby increasing the financial burden on the Whitcombs."

(6) "With respect to the other two alleged preconditions that Ms. Smith claimed the Whitcombs violated, not only were they not contained in the [ ] [A]greement, but even if they had been the evidence supports a finding that the Whitcombs materially complied with those conditions as well."

(7) "Ms. Smith never intended to abide by the terms of the [A]greement" but, rather, "intend[ed] to induce the Whitcombs to contribute their money and services to the Smiths."

(8) "[T]he Whitcombs were highly attentive to Mr. Smith."

(9) "Apart from cosmetic improvements, [the Whitcombs] did not alter their portion of the [P]roperty and so long as they lived there they were attentive to the needs of the Smiths, especially the ailing Mr. Smith."

(10) "Ms. Smith's assertion that the Whitcombs had not complied with their obligations under the [ ] [A]greement was a pretext to justify in hindsight her improper refusal to transfer title to the Whitcombs of the . . . [P]roperty."

(11) "[T]he Whitcombs' testimony as to the underlying facts was credible while Ms. Smith's was not[.]"

(12) "[D]espite her agreement to do so, Ms. Smith never intended to carry out her obligation under the [ ] [A]greement to transfer title to the ... [P]roperty to the Whitcombs and that her conduct from 1999 onward culminating in the superior court judgment against her was the result of Ms. Smith's willful and malicious intent to cause the Whitcombs injury."

Id. at 100–102.

After making the foregoing findings, the bankruptcy court ruled, in pertinent part:

"[Section] 523(a)(6) excepts contractual debts from discharge when those debts result from an intentional or substantially certain injury." Williams [v. I.B.E.W. (In re Williams), 337 F.3d 504, 510 (5th

Cir. 2003) ]; see also Sanders v. Vaughn (In re Sanders), 210 F.3d 390, 2000 WL 328136, at *2 (10th Cir. 2000) (unpublished opinion); Kane [v. Stewart Tilghman Fox & Bianchi P.A. (In re Kane), 755 F.3d 1285, 1296 (11th Cir. 2014)]. Based on the facts in this adversary proceeding as recounted above, that is precisely what occurred. The obligation at issue here arose from Ms. Smith's breach of contract and her actions in connection with that breach were intended to and did cause significant injury to the Whitcombs.

Relevant to the degree of maliciousness in this case, Ms. Smith used the arrangement with the Whitcombs to her advantage and to the significant detriment of the Whitcombs. In the superior court action, Judge Davis found that Ms. Smith was motivated "in significant part, by her interest in extracting the available equity from the Property for her own use through a series of mortgage refinancing and new home equity loans." Whitcomb v. Smith, No. 48 Civ. 0599, 9 n.5 [2014 WL 10999185] (Mass. Supr. Ct. August 5, 2014). My review of the evidence at trial leads me to arrive at the same conclusion. Not only did the Smiths induce the Whitcombs into contributing monthly mortgage payments, but they, primarily Ms. Smith due to Mr. Smith's deteriorating mental condition, knowingly caused the amount of those monthly contributions to increase for Ms. Smith's own benefit.

Id. at 103–04.[6]

The bankruptcy court went on to rule, sua sponte, that Ms. Smith's debt to the Whitcombs was also nondischargeable under § 523(a)(2)(A). Although the Whitcombs' complaint did not include a count under that section, the court reasoned that "[w]hen issues not raised in the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Id. at 105. Under such circumstances, the court elaborated, the court may amend the pleadings sua sponte "[i]n the absence of a motion from the plaintiff." Id. The court pointed primarily to Fed. R. Civ. P. 15(c) and 54(c) for support.

In concluding that Ms. Smith's obligation to the Whitcombs was nondischargeable under § 523(a)(2)(A), the bankruptcy court relied on First Circuit precedent, declaring:

> The First Circuit has stated that "the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." Palmacci [v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)]. An intention not to perform at the time an agreement is entered into is a false representation under ... § 523(a)(2)(A).
>
> > If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.
>
> Id. at 787 (emphasis in original).

The facts adduced at trial support the existence of each of the Palmacci factors. Ms. Smith did not intend to perform the [ ] [A]greement at the time she entered into it. That is a false representation. Her actions were willful and malicious

---

**6.** Ultimately, we do not review the bankruptcy court's conclusion pursuant to § 523(a)(6), as we affirm on § 523(a)(2)(A) grounds. See Discussion, Section II, *infra*.

thereby establishing an intent to deceive and to induce the Whitcombs to rely upon her false representation. The Whitcombs justifiably relied on Ms. Smith's false representation and suffered serious damage as a result. Thus, I find that Ms. Smith's obligation to the Whitcombs is excepted from discharge not only under ... § 523(a)(6) but also under ... § 523(a)(2)(A).

. . .

The evidence introduced at trial was relevant to the issue of whether Ms. Smith falsely represented her intention to comply with the [ ] [A]greement. She was repeatedly pressed, without objection, as to whether she had ever intended to comply with the [A]greement.

. . .

The facts established by the evidence at trial prove that Ms. Smith falsely represented her intention to enter into the [ ] [A]greement with the Whitcombs. The facts also establish that the Whitcombs relied, to their detriment, on Ms. Smith's false representations. Finding no prejudice to Ms. Smith under the mandates of Fed. R. Civ. P. 15(b) and Fed. R. Civ. P. 54(c), I find that such facts entitle the Whitcombs to relief under ... § 523(a)(2)(A).

In re Smith, 555 B.R. at 104–05 (footnote omitted).

Finally, the bankruptcy court "grant[ed] the Whitcombs relief from the automatic stay ... to return to the superior court for the purpose of enforcing their judgment in such manner as the superior court deem[ed] appropriate." Id. at 105. Consistent with the Decision, judgment entered in favor of the Whitcombs and this appeal followed.

## POSITIONS OF THE PARTIES

### I. Ms. Smith

Ms. Smith does not challenge the bankruptcy court's sua sponte amendment to the Whitcombs' complaint to include a claim under § 523(a)(2)(A); nor does she question the court's conclusion that she impliedly consented to the trial of that claim. Instead, she begins by reciting that a creditor must establish the following elements to except a debt from discharge under § 523(a)(2)(A): (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; (2) the debtor intended to deceive; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false statement caused damage. Arguing the bankruptcy court erred in finding the presence of the first two elements, a false representation and an intent to deceive, she concluded there was "no need [for her] to address the remaining four ... elements." Accordingly, she asks the Panel to reverse the bankruptcy court's determination that the Whitcombs' claim is nondischargeable pursuant to § 523(a)(2)(A).

### II. The Whitcombs

Without explicitly citing § 523(a)(2)(A), the Whitcombs argue that Ms. Smith "committed fraud" by consuming the equity in the Property. They maintain that Ms. Smith "saw a cash cow and went for it," extracting as much money from them as she could while never intending to relinquish title. Notably, they insist that they first learned of the three alleged "conditions" of transfer during the state court trial, and that they only discovered the amount of debt encumbering the Property during that trial.

## JURISDICTION

A bankruptcy appellate panel is duty-bound to determine its jurisdiction

before proceeding to the merits, even if not raised by the litigants. Rivera Siaca v. DCC Operating, Inc. (In re Olympic Mills Corp.), 333 B.R. 540, 546–47 (1st Cir. BAP 2005) (citation omitted). A panel may hear appeals from final judgments, orders, and decrees of the bankruptcy court. See 28 U.S.C. § 158(a)-(c). A bankruptcy court's judgment determining dischargeability is a final, reviewable order. Cambio v. Mattera (In re Cambio), 353 B.R. 30, 31 n.1 (1st Cir. BAP 2004) (citations omitted). So, too, is an order granting relief from the automatic stay. Aja v. Emigrant Funding Corp. (In re Aja), 442 B.R. 857, 860 (1st Cir. BAP 2011) (citation omitted). Accordingly, the Panel has jurisdiction to hear this appeal.

## STANDARD OF REVIEW

■ The Panel reviews findings of fact for clear error and conclusions of law de novo. Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 607 (1st Cir. BAP 2010) (citations omitted). Determinations regarding elements of an action under § 523(a)(2) are findings of fact reviewed for clear error. Bellas Pavers, LLC v. Stewart (In re Stewart), BAP No. MB 12-017, 2012 WL 5189048, at *8 (1st Cir. BAP Oct. 18, 2012) (citation omitted). "A finding is clearly erroneous when, although there is evidence to support it, the Panel is left with the definite impression that a mistake has been made." In re Kosinski, 424 B.R. at 607 (citation omitted). "Under the clearly erroneous standard, a reviewing court will not reverse 'simply because it is convinced that it would have decided the case differently.'" Colombo Bank, F.S.B. v. Sharp, 477 B.R. 613, 618 (D. Md. 2008) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly er-

roneous." Anderson, 470 U.S. at 574, 105 S.Ct. 1504 (citations omitted).

## DISCUSSION

### I. Section 523(a)(2)(A)

■ Section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A). Thus, "[a]n action under § 523(a)(2)(A) involves three distinct categories of misconduct—false pretenses, false representation, or actual fraud—albeit with elements that overlap." Privitera v. Curran (In re Curran), 554 B.R. 272, 284 (1st Cir. BAP 2016) (citations omitted). The section is "intended to make certain that bankruptcy protection is not afforded to debtors who have obtained property by means of a fraudulent misrepresentation." Palmacci, 121 F.3d at 786. In order to establish a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must show:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 66 (1st Cir. 2012) (citation omitted) (internal quotations omitted).

■ "Regarding the first element, the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." Palmacci, 121 F.3d at 786. As the First Circuit explained:

A representation of the maker's own intention to do ... a particular thing is fraudulent if he does not have that intention at the time he makes the representation .... [A] promise made without the intent to perform it is held to be a sufficient basis for an action of deceit. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. This is true even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.

The test may be stated as follows. If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

Id. at 786–87 (footnotes omitted) (citations omitted) (internal quotations omitted).

 "Thus, if a debtor enters into a contract with the intent not to pay, the contract may provide a basis for an exception to discharge on the grounds of fraud if the other remaining elements are established." deBenedictis v. Brady–Zell (In re Brady–Zell), 500 B.R. 295, 302 (1st Cir. BAP 2013) (quoting In re Stewart, 2012 WL 5189048, at *8). "However, a debtor's 'mere failure to perform is not sufficient evidence of scienter nor is subsequent conduct contrary to the original representa-

tion necessarily indicative of fraudulent intent.' " Id. (quoting In re Stewart, 2012 WL 5189048, at *8).

 Because the intent to defraud is rarely proven by direct evidence, courts assess this element using a totality of the circumstances approach to discern the debtor's subjective intent. See Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 764 (1st Cir. 1994). "[A] debtor's fraudulent intent can be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor." In re Stewart, 2012 WL 5189048, at *8; see also Robin Singh Educ. Servs., Inc. v. McCarthy (In re McCarthy), 488 B.R. 814, 826 (1st Cir. BAP 2013) (stating fraudulent intent may be "inferred from a course of conduct") (citations omitted). As the Panel previously explained:

> Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance. "*The focus, however, should be on whether the surrounding circumstances or the debtor's actions 'appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor.*"

In re Stewart, 2012 WL 5189048, at *9 (quoting Palmacci, 121 F.3d at 789) (emphasis added).

## II. The § 523(a)(2)(A) Standard Applied

 As the party seeking to prevent Ms. Smith from discharging her debt, the burden was on the Whitcombs to show that Ms. Smith's debt came squarely within an exception to discharge. See Brady–Zell, 500 B.R. at 303. As noted above, the bankruptcy court so found, ruling:

The facts adduced at trial support the existence of each of the Palmacci factors. Ms. Smith did not intend to perform the 1999 agreement at the time she entered into it. That is a false representation. Her actions were willful and malicious thereby establishing an intent to deceive and to induce the Whitcombs to rely upon her false representation. The Whitcombs justifiably relied on Ms. Smith's false representation and suffered serious damage as a result. Thus I find that Ms. Smith's obligation to the Whitcombs is excepted from discharge not only under ... § 523(a)(6) but also under ... § 523(a)(2)(A).

In re Smith, 555 B.R. at 104.

In finding that Ms. Smith misrepresented her intention to keep her promise at the time she made the promise, the bankruptcy court reasoned:

At the time the Smiths initiated discussions with the Whitcombs leading to the 1999 agreement, Mr. Smith had already been diagnosed with cognitive deterioration. I find that Ms. Smith entered into the 1999 agreement to transfer the Union Street property never intending to do so, but rather intending to induce the Whitcombs to contribute their money and services to the Smiths. Ms. Smith's trial testimony supports this conclusion. When asked if she had ever intended to comply with the agreement, Ms. Smith repeatedly and vociferously pointed to the Whitcombs' failure to care for Mr. Smith, as justifying her refusal to comply. But this was untrue. I find based on the evidence that during the time they resided at the Union Street property, the Whitcombs were highly attentive to Mr. Smith.

After considering the evidence presented at the trial, including the testimony of the Whitcombs and Ms. Smith, and having determined the facts to be as set forth above and having independently concluded as Judge Davis had that the Whitcombs' testimony as to the underlying facts was credible while Ms. Smith's was not, I find that despite her agreement to do so, Ms. Smith never intended to carry out her obligation under the 1999 agreement to transfer title to the Union Street property to the Whitcombs ....

Id. at 102.

In determining that Ms. Smith never intended to honor her commitment to transfer title, the bankruptcy court found her repeated insistence during trial that she "absolutely" intended to convey title incredible and rejected her testimony on this issue in its entirety. The bankruptcy court specifically found "the Whitcombs' testimony as to the underlying facts was credible while Ms. Smith's was not[.]" Id.

 Credibility issues fall within the province of the factfinder, whose credibility determinations are to be granted considerable deference. See Boroff v. Tully, 818 F.2d 106, 109 (1st Cir. 1987). Accordingly, reviewing courts generally will not disturb credibility determinations. See Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998); see also In re Kane, 755 F.3d at 1288 ("[W]hen we examine the facts adduced at trial, generally we will not disturb a bankruptcy court's credibility determinations.") (citations omitted); Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 813 (1st Cir. BAP 2005) ("[W]hen factual findings are based on determinations regarding the credibility of witnesses, we must accord even greater deference to the trial court's findings.") (citations omitted). Here, the length of Ms. Smith's delay in transferring title is so inconsistent with her self-serving assertions regarding her intent to honor her promise that the bankruptcy court was justified in finding that Ms. Smith never intended to fulfill her

obligations under the Agreement. Because they are founded on a credibility determination, made with a view toward the totality of the circumstances, we accord great deference at least to the bankruptcy court's findings that the first two Palmacci elements are present: (1) a knowing, false representation; and (2) the intent to deceive. Seeing no clear error, we will not disturb those findings.

In light of the foregoing, Ms. Smith's argument that the bankruptcy court erred in finding the presence of the first two elements is unpersuasive. Although she accurately recited the elements for a claim under § 523(a)(2)(A), Ms. Smith's sole arguments on appeal as to the bankruptcy court's determination of the § 523(a)(2)(A) claim relate to the first two elements; she specifically chose not to address the remaining elements. However, in order to prevail, Ms. Smith was required to establish that the findings below were clearly erroneous. See Pena v. Gonzalez (In re Pena), 397 B.R. 566, 576 (1st Cir. BAP 2008) ("The burden is on the Appellants to show that the bankruptcy court's factual findings were clearly erroneous . . . ."); Mountain Peaks Fin. Servs., Inc. v. Shepard (In re Shepard), 328 B.R. 601, 604 (1st Cir. BAP 2005) ("On appeal, the burden is on the appellant to establish that the bankruptcy court judgment should be reversed, and an appellant bears the heavy burden of showing that evidentiary rulings were manifestly erroneous.") (citation omitted). She has not met that burden. Accordingly, the bankruptcy court's judgment as to § 523(a)(2)(A) is affirmed. Because we affirm the bankruptcy court's determination that Ms. Smith's obligation to the Whitcombs is nondischargeable pursuant to § 523(a)(2)(A), we need not address its holding that her obligation is also excepted from discharge under § 523(a)(6).

### III. Relief from Stay

Ms. Smith's statement of issues on appeal and her brief are silent regarding the bankruptcy court's grant of relief from the automatic stay permitting the Whitcombs to return to state court to enforce the Amended State Court Judgment. Therefore, this issue is waived. Tower v. Leslie-Brown, 326 F.3d 290, 299 (1st Cir. 2003) ("[W]e have made it abundantly clear that failure to brief an argument does, in fact, constitute waiver for purposes of appeal.") (citations omitted); see also City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 91 (1st Cir. 2011) (explaining issue waived unless explicitly listed or "the substance of the issue reasonably can be inferred" from the issues listed).

### CONCLUSION

Based on the foregoing, the judgment is **AFFIRMED.**